582 A.2d 297

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. L.K., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 1, 1990—Decided October 29, 1990.

Before Judges J.H. COLEMAN, DREIER and LANDAU.

*John J. Scaliti,* Assistant Prosecutor, argued the cause for appellant (*John J. Fahy,* Prosecutor of Bergen County, attorney; *Sharyn J. Peiffer,* Assistant Prosecutor, of counsel; *Sharyn J. Peiffer* and *John J. Scaliti* on the letter brief).

*Salvatore T. Alfano* argued the cause for respondent (*Clapp & Eisenberg,* attorneys; *Edward N. Fitzpatrick* of counsel; *Salvatore T. Alfano* on the brief).

The opinion of the court was delivered by

COLEMAN, J.H., P.J.A.D.

The novel issue presented in this appeal is whether the procedural safeguards regarding the use of hypnotically-enhanced evidence articulated in *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981), should apply to a defendant or defense witnesses. We hold that they should apply, but additional safeguards must be followed.

This case deals with an insanity defense based on expert testimony which may rely, at least in part, on hypnotically-aided statements of the defendant. We must decide how the *Hurd* procedural safeguards must be implemented to aid the trial court in deciding the reliability and admissibility of hypnotically-affected testimony of defendant and opinion testimony from her examining psychiatrists. As this is an interlocutory appeal that is being prosecuted before the trial commences, we are unable to define the expected testimony with any precision. Indeed, some of the psychiatric examinations have not yet been conducted. From the present record, it appears that the insanity defense may be based on multiple personality disorders (MPD), and defendant will contend that it was one of her other personalities called "Angel" who was acting when the alleged offenses occurred.[1]

---

[1] Our research uncovered two reported New Jersey cases in which MPD is involved. *State v. Moore,* 113 *N.J.* 239, 267, 286–287, 550 *A.*2d 117 (1988), involved an insanity defense based on multiple personality disorder that allegedly resulted from a history of sexual abuse. *State v. Badger,* 229 *N.J.Super.* 288, 293, 551 *A.*2d 207 (Law Div.1988), involved a question of defendant's competency to stand trial in the face of a multiple personality disorder. Neither case involved the use of hypnosis. *See also State v. Noel,* 102 *N.J.L.* 659, 678, 132 *A.* 274 (E. & A.1926), that involved split personalities.

## I

Defendant was arrested on October 24, 1988 for allegedly murdering her father and aunt on October 22, 1988. A Bergen County Grand Jury returned Indictment No. S–382–89 against defendant for the two alleged murders, contrary to *N.J.S.A.* 2C:11–3a(1) and (2); for conspiracy to murder her father, her aunt and her nine-year-old brother, contrary to *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:11–3a(1) and (2); for two counts of attempting to murder her aunt and father, contrary to *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3a(1); and for attempting to murder her brother, contrary to *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3a(1). Because of her inability to post bail, defendant remains in custody pending disposition of these charges.

On October 11, 1989, defense counsel advised the trial judge and the prosecutor that defendant would rely on the defense of insanity. *See N.J.S.A.* 2C:4–1. This was followed by a formal written notice. *See R.* 3:12. On November 14, 1989, the defense furnished the State with copies of reports of psychiatric examinations conducted by Dr. Dorothy Lewis and Dr. Robert Sadoff in preparation for the insanity defense. These reports indicated that L.K. was the victim of severe sexual abuse by her father and that she was legally insane at the time of the crimes because she suffered from MPD.

On November 27, 1989 the State notified defense counsel and the defense psychiatrists of its desire to have all future interviews of defendant videotaped because of the uniqueness of an insanity defense based on MPD. The State also inquired whether any of the interviews by the defense psychiatrists had been videotaped. On January 31, 1990, the State filed a motion (1) to compel discovery of all video and/or audio tapes and all notes of psychiatric interviews with defendant wherein the alleged multiple personalities asserted themselves; (2) to direct that all future psychiatric interviews of defendant be conducted on videotape and that during the State's psychiatric examination, only the State's psychiatrist be present; and (3) to compel

discovery of all of defendant's medical and psychiatric records, psychiatric reports that would be used in furtherance of the defense, notes of interviews in which the multiple personalities asserted themselves, and other discovery mandated by *R.* 3:13–3(b).

The motion was argued on March 30, 1990.[2] The trial judge denied the motion in an order dated April 18, 1990. Defense counsel, however, was directed to deliver to the prosecutor a copy of Dr. Lewis's supplemental report as soon as defense counsel had reviewed it. A copy of Dr. Lewis's final report was delivered to the prosecutor on April 19, 1990. On April 23, 1990, the prosecutor requested further discovery consisting of various medical and psychiatric records of defendant detailing alleged sexual abuse of defendant by her father. Apparently, the prosecutor had reason to believe that not all of such records had been given to the State.

To assist with preparation of what all parties recognize as a novel insanity defense in this State, the trial judge arranged for the psychiatric experts selected by the defendant and by the State to meet. The defense experts, Drs. Lewis and Sadoff met with the State's experts, Dr. Martin Orne and Dr. Steven Simring on May 16, 1990. Two days later, the State filed a motion for reconsideration of the April 18 order. The certification of Dr. Orne which accompanied the motion stated that since Dr. Lewis and Dr. Sadoff concluded that defendant has MPD, "it would be very important to know the details of their examinations and the basis for their diagnosis." Dr. Orne further stated his "understanding that the psychiatrists state that patient was not hypnotized, and it is therefore especially important to obtain the details of how the patient was treated during the actual evaluations, particularly the antecedent

---

[2]At the time the motion was argued, the State withdrew its application to exclude defense psychiatrists from its psychiatric examination of L.K.

events which led to the manifestation of alters such as Angel and Angelique."

The motion for reconsideration was denied by order dated May 31, 1990. That order permitted Dr. Orne to file a supplemental certification, since he was not permitted to testify at the hearing on the reconsideration motion. Defendant was granted five days to respond. In a supplemental certification, Dr. Orne states:

6. On May 16, Dr. Steven Simring and I met with the defense psychiatrists, Dr. Dorothy Lewis and Dr. Robert Sadoff. This meeting was arranged pursuant to a ruling by Judge Madden.

7. At that meeting, the defense psychiatrists revealed that a videotape had been made of one of their interviews with defendant wherein multiple personalities asserted themselves. It is possible that there are additional videotapes or audiotapes which were not discussed.

8. Dr. Sadoff informed me that he has no objection to turning over this videotape to the State.

9. Dr. Lewis informed me that the multiples began to assert themselves only after she had relaxed the defendant who then went into a dissociative trance-like state. This is a form of hypnosis. (See S–2 attached, "Hypnosis" by Martin T. Orne and A. Gordon Hammer from the fifteenth edition of *Encyclopedia Britannica*).

\*        \*        \*        \*        \*        \*        \*        \*

11. All psychiatrists agreed that the State's psychiatric interviews with defendant should be videotaped and both Dr. Sadoff and Dr. Lewis agreed that they would view the interviews as they were conducted but they would be outside the defendant's presence. This would conform to the guidelines of *State v. Hurd*, 86 *N.J.* 525 [432 *A*.2d 86] (1981) and would ensure that whatever information was obtained could be assessed by all mental health professionals.

Pursuant to the court's order of May 31, the defense submitted an opinion letter written by Dr. Lewis dated November 7, 1989 in response to Dr. Orne's supplemental certification. While it does not appear to be responsive, we nonetheless refer to it to complete the record. That letter states:

I have now interviewed [L.K.] on four different occasions and have spent several hours with her each time we met. I have also reviewed the materials you provided me which included medical and educational records, and statements made by [L.K.] and others to the police.

Based on my psychiatric evaluation and review of records it is my clinical opinion that, for an extended period of time, including the evening prior to [L.K.'s] father's and Aunt's deaths and the day of their deaths, [L.K.] was

suffering from a serious psychiatric disorder, namely, multiple personality. Because of this disorder, [L.K.] herself was not able to understand the nature of her behaviors; nor was she able to appreciate the wrongfulness of her behavior. As such, in my clinical opinion, she meets the standard for insanity according to the McNaughton rule.

In order to complete my examination I shall need to meet with her several more times. Once the evaluation is finished I shall prepare a more detailed psychiatric report for you.

Significantly, the defense has not denied Dr. Orne's assertion that defendant was under hypnosis by Dr. Lewis when the multiple personalities asserted themselves. Our decision assumes the correctness of that assertion since the defendant does not contend otherwise in this appeal.

On July 6, 1990, we granted the State leave to appeal and we accelerated the appeal.

## II

The State contends on this appeal that the trial judge erred when he denied its motion for further discovery. The State argues that it is entitled to the requested discovery before the State's psychiatrists examine defendant. The State asserts that after reviewing the defense psychiatric reports, the defense theory of insanity will be based on the following:

1. "Angel," one of the multiple personalities and not L.K., the "host personality" is criminally responsible for the carnage in Upper Saddle River;

2. L.K. developed MPD because her father brutally sexually and physically abused her, starting when she was approximately five and continuing until shortly before her father's death;

3. "Angel," L.K.'s protector appears during periods of stress and trauma, when L.K. dissociates, which purportedly explains why L.K. does not remember much concerning the brutal sexual encounters with her father;

4. "Angel" did not appear to the defense psychiatrists until some time into their analysis;

5. "Angel" avenged L.K. by "encouraging" her cousin Patrick to kill her father and aunt; and,

6. "Angel" acknowledged that L.K. had never agreed to kill her father, as L.K. loved him and he was all she had left.

It is the State's position that the defense used hypnosis and that while defendant was hypnotized the multiple personalities asserted themselves. Because the defense obtained hypnotical-

ly-enhanced evidence, the State argues that it is entitled to the requested discovery, based on *State v. Hurd*, before conducting its psychiatric examinations.

We disagree that *State v. Hurd* requires the defendant to turn over such discovery prior to the State's experts examinations. In denying the State's requests, the trial judge made clear that his decision was, in large part, based upon the fact that the State had not yet conducted its psychiatric examination of defendant, and that what Dr. Orne claims he needs prior to such an examination is not controlling. The judge concluded that the State's psychiatrists must perform "their own independent examination of defendant as opposed to a critique of the defense psychiatrists' conclusion."

We fully agree that the State must first conduct its examination before the issue of admissibility of hypnotically-enhanced evidence can be considered. When conducting its examinations, however, the State must also be mindful of the *Hurd* requirements respecting admissibility which we will discuss later. At this juncture, the State must conduct its own examinations to determine what its position will be concerning the MPD insanity defense. Thereafter, if the State disputes this defense, the trial judge must conduct a hearing to determine whether any hypnotically-enhanced evidence will be admissible. But until the State's examinations have been conducted, except for recordation required by *Hurd,* there is no way to know whether or how the procedural safeguards articulated in *Hurd* should be implemented.

We therefore conclude that *R.* 3:13–3(b) does not require the defendant to give video and/or audio tapes and notes to the State before the State conducts its examinations. To that extent, we affirm the trial court's orders of April 18 and May 31. However, the other medical and psychiatric records that will be used in furtherance of the defense are discoverable under *R.* 3:13–3(b). If they have not been turned over, defense counsel is directed to do so forthwith.

### III

■ *State v. Hurd* involved a stab victim who was unable to identify her attacker until she was hypnotized. The main focus in *Hurd* was whether the hypnotically-enhanced testimony of the victim was reliable. The Court recognized that unless the use of hypnosis is carefully controlled, it is not generally accepted by the scientific community as a reliable means of obtaining accurate recall. *Id.* 86 *N.J.* at 539, 432 *A.*2d 86. Consequently, the Court rejected the contentions that testimony refreshed through hypnosis is *per se* inadmissible, or automatically admissible. Instead, *Hurd* recognized that hypnosis can be considered a reasonably reliable means of restoring the memory of a witness. But *Hurd* requires the proponent of the hypnotically-induced recall to first establish an acceptable level of reliability in the particular case before such evidence is admissible. In other words, New Jersey has adopted its own version of the well-known *Frye* rule (*Frye v. United States,* 293 *F.* 1013 (D.C.Cir.1923)) respecting the standard for determining the reliability of scientific evidence before that evidence is admissible. *State v. Hurd,* 86 *N.J.* at 536, 432 *A.*2d 86. Our present formulation of that standard requires a "sufficient scientific basis to produce uniform and reasonably reliable results [that] will contribute materially to the ascertainment of the truth." *Ibid.,* quoting *State v. Cary,* 49 *N.J.* 343, 352, 230 *A.*2d 384 (1967). *See also State v. Pitts,* 116 *N.J.* 580, 622, 562 *A.*2d 1320 (1989).

■ The Supreme Court recognized in *Hurd* that the traditional procedural safeguards such as cross-examination and an opportunity to observe a witness's demeanor are not sufficient to determine the reliability and hence the admissibility of hypnotically-induced recall. To assist with these determinations, our Supreme Court adopted an intricate set of procedural safeguards. However, the Court was careful to point out that none of the safeguards should be considered absolute prerequisites to admissibility. *State v. Hurd,* 86 *N.J.* at 545, 432 *A.*2d

86. In addition to requiring that either a psychiatrist or psychologist experienced in the use of hypnosis who is independent of the prosecutor and the defense conduct the examination, the following safeguards were established:

1. Information given to the hypnotist by either side must be recorded,

2. The session must be recorded, preferably on videotape,

3. Only the hypnotist and the subject should be present during *any* phase of the session,

4. A detailed description of the facts as the subject remembers them must be recorded by the hypnotist before inducing hypnosis,

5. All contacts between the hypnotist and the subject must be recorded, and

6. The party who wishes to introduce hypnotically-induced memory must give reasonable notice to the opponent and must submit a copy of the "recording session and other pertinent material." [*State v. Hurd*, 86 *N.J.* at 543–547, 432 *A.*2d 86]

The State argues that *State v. Hurd* is applicable to this case. The defendant disagrees and asserts that to apply the *Hurd* conditions to this defendant would violate her right to effective assistance of counsel and the defense attorney's work product privilege.

First, we conclude that the procedural safeguards articulated in *Hurd* are applicable to both the defendant and the State. *Hurd* specifically makes its guidelines applicable to any "party in a criminal trial." *Id.* 86 *N.J.* at 543, 432 *A.*2d 86.

Second, we hold that compliance with the *Hurd* guidelines does not violate the work product privilege or the right to effective assistance of counsel. It is the defendant in this case who may seek to introduce hypnotically-affected evidence at the trial to support her insanity defense.[3] Notice of this intent has been served on the prosecutor pursuant to *R.* 3:12. Because the insanity defense implicates hypnotically-enhanced testimony, *Hurd* merely requires defendant to disclose information

---

[3]We recognize that unlike *Hurd,* the present case may also involve expert opinion testimony based upon hypnotically assisted examinations of defendant. Because reliability of the underlying basis for such an opinion is of critical importance, we have determined that the *Hurd* standard should be employed.

that she would shortly reveal at trial in an effort both to persuade the judge to admit that testimony and also to enhance its credibility before the jury. *Hurd* simply advances the time for disclosure. *See Estelle v. Smith*, 451 *U.S.* 454, 465, 101 *S.Ct.* 1866, 1874, 68 *L.Ed.*2d 359, 370 (1981); *State v. Montague*, 55 *N.J.* 387, 397, 262 *A.*2d 398 (1970).

Early disclosure related to an insanity defense where the *Hurd* guidelines are implicated is analogous to early disclosure pursuant to an alibi defense under *R.* 3:11–1. In either case, "The constitution does not protect a defendant from the consequences of the defense [she] makes, nor assure [her] a right to defend as to deny the State a chance to check the truth of [her] position." [Citations omitted]. *State v. Angeleri*, 51 *N.J.* 382, 385, 241 *A.*2d 3 (1968). It would indeed be a strange doctrine to permit defendant to raise insanity as a defense based on MPD that relies at least in part, on hypnotically-enhanced evidence and then invoke the constitution for the purpose of preventing the State from being prepared to test the reliability of that evidence—regarded as being highly susceptible to impermissible suggestiveness—until the point in the trial in which defendant decides whether she will take the stand and/or offer her experts' testimony. *See State v. Whitlow*, 45 *N.J.* 3, 11, 210 *A.*2d 763 (1965).

Furthermore, it is now well-established that not even a defendant during the guilt or penalty phase of a criminal case is permitted to introduce scientific evidence that may not be reliable without satisfying the appropriate pre-admission standard. *State v. Kelly*, 97 *N.J.* 178, 209–210, 478 *A.*2d 364 (1984); *State v. Davis*, 96 *N.J.* 611, 617, 622, 477 *A.*2d 308 (1984). Eleven years earlier, the United States Supreme Court stated that a defendant in a criminal case is not exempt from "rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.*2d 297, 313 (1973). More recently, the Supreme Court of the United States stated that a state would be well within its

powers "if it established guidelines to aid trial courts in the evaluation of post-hypnosis testimony." *Rock v. Arkansas*, 483 *U.S.* 44, 61, 107 *S.Ct.* 2704, 2714, 97 *L.Ed.*2d 37, 52 (1987). *Rock* held that a *per se* rule which excludes a defendant's hypnotically-enhanced testimony is unconstitutional, but that pre-admission standards can be established.

It would be an artificial and unprincipled distinction to hold that safeguards should be applied in determining the admissibility and credibility of hypnotically-induced or enhanced testimony of a witness offered by the prosecution but not when the same kind of evidence is offered by the defendant to exculpate himself or herself. The issue is the reliability of evidence based upon hypnotic state which has been recognized to be highly susceptible to impermissive suggestiveness. This is so irrespective of who proffers such evidence. The salutary purpose of requiring evidence to be reliable is to prevent the trier of fact from being misled by unsound scientific methods.

While our research has failed to discover any reported case in this State in which the *Hurd*-type procedural guidelines have been applied to a defendant in a criminal case, other jurisdictions have done so since *Rock v. Arkansas* approved of the *Hurd*-type guidelines. *See State v. Butterworth*, 246 *Kan.* 541, 792 *P.*2d 1049 (1990); *State v. Coogan*, 154 *Wis.*2d 387, 453 *N.W.*2d 186 (1990); *People v. Aguilar*, 267 *Cal.Rptr.* 879, 218 *Cal.App.*3d 1556 (1990); *State v. Woodfin*, 539 *So.*2d 645 (La.App.1989); *State v. Holden*, 554 *So.*2d 121 (La.App.1989); *Hammond v. State*, 569 *A.*2d 81 (Del.1989); *Morgan v. State*, 537 *So.*2d 973 (Fla.1989); *State v. Alley*, 776 *S.W.*2d 506 (Tenn. 1989); *Haakanson v. State*, 760 *P.*2d 1030 (Alaska App.1988); *Tumlinson v. State*, 757 *S.W.*2d 440 (Tex.App.1988); *Rault v. Butler*, 826 *F.*2d 299 (5th Cir.1987). *See also* Annotation, *Admissibility of Hypnotically Refreshed or Enhanced Testimony*, 77 *A.L.R.*4th 927, § 8; Annotation, *Admissibility of Hypnotic Evidence*, 92 *A.L.R.*3d 442, § 10(a) (1979); Fox and Fox, *Reciprocal Hypnosis: A New Standard for the Admission of Posthypnotic Testimony*, 20 Pac.L.J. 815 (1989); Note,

*Hypnosis and the Right to Testify: An Evidentiary and Constitutional Dilemma for Connecticut,* 90 U. Bridgeport L.Rev. 359 (1988); and Note, *Fifth, Sixth, and Fourteenth Amendments—A Constitutional Paradigm for Determining the Admissibility of Hypnotically Refreshed Testimony,* 78 J.Crim.L. & Criminology 853 (1988).

Additionally, a few states have dealt with an insanity defense based on MPD where hypnosis was used. In *State v. Alley,* 776 *S.W.*2d 506 (Tenn.1989), the defendant was charged with murder. Defendant's psychiatrist examined the defendant while he was under the influence of sodium amytal and under hypnosis. The expert testified that the multiple personalities asserted themselves during the session. He said defendant had one alternate personality and possibly two, but he could not say that either of the alternate personalities was in control at the time of the offense. The psychiatrist admitted that he had no special experience in the area of MPD. The trial judge concluded the videotaped hypnotic and sodium amytal interviews should be excluded from the jury's consideration because they were found to be "sensational, the defendant to be untruthful and the tapes unreliable." The judge also precluded the experts who viewed the tapes from testifying respecting "the words and action of the defendant during the course of these interviews." The jury was informed, however, as to the existence of the tapes. The experts were permitted to express their opinions whether MPD were revealed during the sessions. The court rejected an argument that *Rock* required admission of the tapes that were found to be unreliable.

In *State v. Rodrigues,* 67 *Haw.* 70, 679 *P.*2d 615 (1984), defendant was charged with rape and sodomy of young children. He entered a defense of mental defect, disease or disorder under that state's statute. His defense was based on multiple personality syndrome (MPS), defined as

a disorder where there are within one individual, two or more distinct personalities, each of which is dominant at a particular time. Each individual personality is complex and integrated with its own behavior pattern and the personality

that is dominant at any particular time determines the individual's behavior. Often there is amnesia on the part of one personality for the existence of the other. [*Id.* at 618]

This definition of MPS is quite similar to the description of MPD contained in *State v. Alley, supra*, 776 *S.W.*2d at 511. There MPD was described as "a condition where the physical body belonged to two or more distinct, well-integrated personalities, each with a separate set of memories that the other is completely unaware of, a total amnesia about the other personalities." *Ibid.*

The Hawaii Supreme Court in *Rodrigues* further observed that the disorder of MPS

is extremely rare and has recently come to the attention of several courts. The trend in these courts is toward examining the sanity of each personality presented in an individual, or at least the personality which allegedly committed the offense.

The law adjudges criminal liability of the person according to the person's state of mind at the time of the act; we will not begin to parcel criminal accountability out among the various inhabitants of the mind.

*Kirkland v. State*, 166 Ga.App. 478, 304 S.E.2d 561 at 564 (1983). Recent cases dealing with the multiple personality defense have held that it is immaterial whether the defendant was in one state of consciousness or another, so long as in the personality then controlling the behavior, the defendant was conscious and his or her actions were a product of his or her own volition. *State v. Darnall*, 47 Or.App. 161, 614 P.2d 120 (1980); *State v. Grimsley*, 3 Ohio App.3d 265, 444 N.E.2d 1071 (1982); and *Kirkland, supra.*

The cases dealing with MPS can be examined in a similar fashion as other defenses of insanity. If a lunatic has lucid intervals of understanding he shall answer for what he does in those intervals as if he had no deficiency. The law governs criminal accountability where at the time of the wrongful act the person had the mental capacity to distinguish between right and wrong or to conform his conduct to the requirements of the law. Since each personality may or may not be criminally responsible for its acts each one must be examined under the American Law Institute (ALI)–Model Penal Code (MPC) competency test. *See State v. Nuetzel*, 61 Haw. 531, 606 P.2d 920 (1980), and *Kirkland, supra.* [*State v. Rodrigues*, 679 *P.*2d at 618] [4]

One of Rodrigues's experts testified that he examined and treated defendant through hypnosis. Tapes were made of the

[4]While these cases might be instructive, this opinion does not purport to deal with the issue of whether the insanity defense based on MPD is an appropriate defense in this case.

sessions. He testified that defendant was in one of the other personalities when he committed the crimes and although that personality could appreciate the wrongfulness of his acts, that personality could not conform his behavior to the requirements of the law. Without any discussion concerning any *Hurd*-like procedural guidelines, the Court concluded that there was enough evidence to submit to the jury the issue of defendant's mental status.

Finally, in *Tumlinson v. State*, 757 *S.W.*2d 440 (Tex.App. 1988), defendant argued that the exclusion of his hypnotically-enhanced testimony, as well as the testimony of the hypnotist, violated *Rock v. Arkansas, supra.* The argument was rejected because in Texas such evidence is excluded where there is a finding that *Hurd*-type guidelines have not been followed and the proffered evidence is found to be unreliable.

Consequently, we are satisfied that *Rock v. Arkansas* and the overwhelming weight of authority from other jurisdictions support our conclusion that the *Hurd* guidelines are applicable to defendants in criminal cases.

### IV

Next we must consider how the *Hurd* procedural guidelines will impact upon the procedure employed in this case. Implementation of those guidelines requires the trial judge to enter upon a three-step process. The first step requires the judge to decide the appropriateness of hypnotically-aided testimony in this case. *See State v. Hurd, supra,* 86 *N.J.* at 544, 432 *A.*2d 86. If the judge decides this is an appropriate case for use of hypnotically-aided recall, the judge must then move to step two of the process. Step two requires the judge to conduct a *Rule* 8 hearing to decide whether the hypnotically-aided testimony is reliable based on the *Hurd* guidelines. *Id.* 86 *N.J.* at 544–545, 432 *A.*2d 86. Assuming that at the conclusion of the *Rule* 8 hearing the judge decides that some or all of the hypnotically-enhanced or aided evidence is reliable and thus admissible, the

third step in the process requires the judge to determine whether the evidence in its totality requires submission of the insanity defense to the jury. These are separate issues and only the second step in the process is involved in this appeal.

Under the second step outlined above, only post-hypnosis testimony of defendant's expert found to be unreliable may be excluded from the trial before the jury. *See Rock v. Arkansas*, 483 *U.S.* at 61, 107 *S.Ct.* at 2710–2711, 97 *L.Ed.*2d at 52. The primary purpose of the *Hurd* guidelines is to assist the court in deciding whether the post-hypnosis testimony is admissible. Because the stakes are high in view of the pending charges, we deem it appropriate to erect an additional procedural safeguard in an effort to minimize any impact on defendant's constitutional rights. We direct the trial judge to conduct an *in camera* review of the prehearing evidence required by *Hurd* before the same is delivered to the prosecutor. The trial judge should redact the prehearing evidence if it exceeds the scope contemplated by *Hurd*. By so doing, the need to establish reliability will not clash with any legitimate rights of the accused.

The jury should not be informed of the judge's decision respecting reliability and admissibility made pursuant to the second step in the process. The proponent of the hypnotically-enhanced testimony has the burden of establishing reliability and admissibility by clear and convincing evidence. *Hurd*, 86 *N.J.* at 546, 432 *A.*2d 86. We recognize that *Hurd* instructs that the reliability-admissibility determination may be made "either at a pretrial hearing or at a hearing out of the jury's presence." *Id.* 86 *N.J.* at 543, 432 *A.*2d 86. Because of the complexities involved in a hearing to test the reliability and admissibility of evidence involving hypnosis and MPD, we direct that this pre-admission determination be made in a *Rule* 8 hearing which is to be concluded at least 15 days prior to trial. We also direct that the defendant's evidence required by *Hurd* to be exchanged, be delivered to the trial judge at least 35 days

prior to trial. The trial judge shall conduct an *in camera* inspection promptly and then deliver the *Hurd* documents and tapes to the prosecutor at least 10 days before commencing the *Rule* 8 hearing.

As our Supreme Court has determined, the State cannot use the prehearing information except to attack the reliability, admissibility, credibility of the hypnotically-induced evidence and the merits of the insanity defense. *See State v. Risden,* 56 *N.J.* 27, 36, 264 *A.*2d 214 (1970); *State v. Whitlow,* 45 *N.J.* at 26, 210 *A.*2d 763. If any hypnotically-induced testimony is found to be admissible, the opponent may present expert testimony during the trial to challenge the reliability of the *particular* procedures followed. It goes without saying that the opponent may vigorously cross-examine respecting that evidence. *Rock v. Arkansas,* 483 *U.S.* at 61, 107 *S.Ct.* at 2710–2711, 97 *L.Ed.*2d at 52. Once the hypnotically-induced evidence is admitted, however, the opponent may not "attempt to prove the general unreliability of hypnosis." *State v. Hurd,* 86 *N.J.* at 543, 432 *A.*2d 86.

If the trial judge excludes a portion of a defense expert's opinion because it was not sufficiently reliable, the witness for the defense must be allowed to testify on other matters relating to the insanity defense that were not expressly covered in the hypnotic session and were ascertained without the aid of hypnosis. The reliability of pre-hypnotic information can be established by application of the *Hurd* safeguards and other means of independent verification. The judge should remember that the *Hurd* guidelines are neither absolute nor exhaustive prerequisites to admissibility. If, for instance, the expert did not receive or did not record defendant's detailed description of the facts before inducing hypnosis, the trial judge must decide whether there is sufficient independent verification of the pre-hypnotic evidence to establish its reliability.

Additionally, if as a result of the *Rule* 8 hearing the trial judge decides that defendant's own hypnotically enhanced testi-

mony does not satisfy the *Hurd* procedural guidelines, defendant still cannot, except perhaps in the most exceptional case, be excluded from taking the stand in the trial before the jury. But the Supreme Court stated in *Rock:* "[the State] may be able to show that [defendant's] testimony in a particular case is so unreliable that exclusion is justified." 483 *U.S.* at 61, 107 *S.Ct.* at 2710–2711, 97 *L.Ed.*2d at 52. However, we are not called upon to decide whether the defendant in this case may be precluded from testifying before the jury. If defendant does testify before the jury, the trial judge may permit the State to attack her testimony on the basis that her testimony is unreliable and not based on pre-hypnotic memory but upon pseudomemories implanted during the hypnosis or otherwise tainted by suggestions or confabulation. *Ibid.* Further, the judge may inform the jury that a hypnotized person may be unable to distinguish his or her true memories from pseudomemories implanted during hypnosis. *Ibid.* Yet the hypnotized person may be convinced of the accuracy of the pseudomemories, thereby substantially impairing cross-examination. *State v. Hurd,* 86 *N.J.* at 540, 432 *A.*2d 86.

Even though we cannot now decide whether defendant may or should be precluded from testifying before the jury, the judge must be extremely careful not unreasonably to impair defendant's constitutional right to testify on her own behalf. *See Rock v. Arkansas,* 483 *U.S.* at 49–53, 107 *S.Ct.* at 2707–10, 97 *L.Ed.*2d at 44–47; *People v. Shirley,* 31 *Cal.*3d 18, 67, 181 *Cal.Rptr.* 243, 273, 723 *P.*2d 1354, 1384 (1982). Live testimony from an accused as to matters he or she can verify were independently remembered before hypnosis, should always be admitted. To hold otherwise would mean the hypnosis automatically operated "to the detriment of any defendant who undergoes hypnosis, without regard to the reasons for it, the circumstances under which it took place, or any independent verification of the information it produced." *Rock v. Arkansas,* 483 *U.S.* at 56, 107 *S.Ct.* at 2712, 97 *L.Ed.*2d at 49.

Defendant's right to testify on her own behalf does not permit her to use a tape of the hypnotic session as a substitute for live testimony. Tapes can be used only to corroborate or to contradict live testimony. To permit tapes to be a substitute for live testimony deprives the opposing party of the right of cross-examination.

## V

As we mentioned previously, only the defendant has conducted psychiatric examinations. To avoid further delays, we direct the State forthwith to conduct any desired psychiatric examinations. We further direct that any session in which hypnosis is used shall be videotaped. We are aware that *Hurd* makes videotaping merely optional. However, in light of the increased availability of videotaping equipment nine years after *Hurd*, its widespread use and the need to have a record which best reveals reactions and the techniques employed as well as the manner in which mere words were spoken, we have made it a requirement in this case.

Finally, we direct that pursuant to *Hurd*, only the State's psychiatrist and the defendant should be in the examining room during the State's examinations. But to balance defendant's qualified Fifth and Sixth Amendment rights to the presence of her psychiatrists in the examining room, *see State v. Whitlow*, 45 *N.J.* at 26–28, 210 *A.2d* 763, against the *Hurd* requirements, we direct the trial judge to devise, with assistance from counsel, an appropriate solution. Two approaches could be the use of one-way mirrors or closed circuit television in conjunction with audio capabilities.

As modified, the orders under review are affirmed.