STATE of Wisconsin, Plaintiff-Respondent,

v.

Mark INGLIN, Defendant-Appellant.

Court of Appeals

*No. 97–3091–CR. Oral argument November 30, 1998.—Decided February 16, 1999.*

(Also reported in 592 N.W.2d 666.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Stephen M. Glynn* and *Robert R. Henak*, of *Shellow, Shellow & Glynn, S.C.*, of Milwaukee. There was oral argument by *Robert R. Henak*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, and *James H. McDermott*, assistant attorney general. There was oral argument by *James H. McDermott*.

Before Fine, Schudson and Curley, JJ.

SCHUDSON, J.   Mark Inglin appeals from the judgment of conviction, following a jury trial, for two counts of Interference with Child Custody: one count in violation of § 948.31(1)(b), STATS., and the other in violation of § 948.31(3)(a), STATS.[1] He also appeals from the order denying his motion for postconviction relief.

Inglin argues: (1) that the evidence was insufficient to convict him of "taking away" his son from his ex-wife without her consent, as the jury was instructed on count one, because, he maintains, it was undisputed that she consented to the taking, although not to his subsequent withholding of their son from her; (2) that Wisconsin did not have jurisdiction over his concealing of his son, as charged in count two, because, he maintains, all acts comprising the concealment took place outside of Wisconsin; and (3) the trial court denied him due process by precluding his affirmative defense that he was authorized by law to take away and conceal his son because he reasonably believed that his son was in danger of emotional harm.[2]

---

[1] The judgment inaccurately refers to the second count as a violation of § 948.31(1)(a), STATS. We remand for correction of the judgment to reflect Inglin's conviction under § 948.31(3)(a), STATS.

[2] Inglin also argues that any failure of trial counsel to preserve the substantive issues raised on this appeal constituted ineffective assistance of counsel, and that "reversal is appropriate in the interests of justice . . . or as an exercise of the Court's discretion based upon [his] substantive claims despite any claimed waiver of those claims." Because we address and reject

We conclude that the evidence was sufficient on count one, that the Wisconsin trial court had jurisdiction on count two, and that Inglin was not denied the affirmative defense he requested. We further conclude that the evidence was insufficient to support a related affirmative defense for which Inglin now argues. Accordingly, we affirm.

## I. BACKGROUND

The facts relevant to resolution of this appeal are undisputed. Pursuant to a judgment of divorce entered on May 12, 1994, Inglin and his ex-wife, Jill Gennari, had joint custody of their son, Erich. Erich's "primary physical placement" was with Gennari, and his "extensive physical placement" was with Inglin. In June 1995, when Erich was four years old, Inglin and Gennari agreed that Erich would go with Inglin for what was to have been a ten-day camping trip to Colorado.[3]

---

Inglin's claims on the merits, we need not address these additional arguments. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issues need be addressed).

[3] The May 2, 1995 letter agreement, prepared by the mediator Inglin and Gennari designated to resolve placement issues, *see* § 767.11, STATS., stated, in relevant part, that "Mark will have vacation placement from June 9, through June 18, 1995." Its terms, however, were subsequently modified. As summarized in the findings of the family court's subsequent temporary order suspending all periods of placement with Inglin:

1. That the parties, through mediation with Attorney Lawrence P. Kahn, reached an agreement that provided for respondent, MARK INGLIN, to take the minor child Erich with him on vacation for the period of time from *June 9, 1995 through June 18, 1995.* Further, the parties subsequently agreed that period of time to be modified slightly to begin on *June 13, 1995 through June 22, 1995.*

Instead of taking Erich to Colorado, Inglin took him to Canada. In fact, as Inglin conceded at trial, soon after picking up Erich for the camping trip, he decided to keep him permanently. The evidence established that Inglin had made extensive arrangements to accomplish that goal even before picking up Erich.[4] Approximately two months later, Canadian law enforcement authorities found Inglin and Erich living in British Columbia; Inglin was arrested, and Erich was returned to Gennari.

Inglin was charged with two counts of Interference with Child Custody in violation of two subsections of § 948.31, STATS., which, in relevant part, provide:

> [(1)](b) [W]hoever intentionally causes a child to leave, takes a child away or withholds a child for more than 12 hours beyond the court-approved period of physical placement or visitation period from a legal custodian with intent to deprive the custodian of his or her custody rights without the consent of the custodian is guilty of a Class C felony. This paragraph is not applicable if the court has entered an order authorizing the person to so take or withhold the child. The fact that joint legal custody has been awarded to both parents by a court

---

2. That consistent with that period of vacation that the minor child Erich was to be with his father, it was understood that part of that time would be spent by them at campgrounds in Durango, Colorado.

[4] Among other things, Inglin sold his house and furniture, arranged for his brother in Ohio to conduct his business, transferred funds from a Swiss bank account to a Canadian bank account, exchanged cars with his brother in order "to use a vehicle that would give [him] enough time to establish [him]self somewhere without being caught," and was in the process of purchasing a home in British Columbia at about the time of his arrest.

does not preclude a court from finding that one parent has committed a violation of this paragraph.

. . . .

(3) Any parent . . . who does any of the following is guilty of a Class C felony:
(a) Intentionally conceals a child from the child's other parent.

The complaint alleged that Inglin committed the crimes on or about June 24, 1995 but, at the beginning of the trial, the information was amended to charge that he committed the crimes "[b]etween June 24, 1995 and August 16, 1995," spanning the period from the date of what was to have been Inglin's return of Erich from the camping trip to the date of Inglin's arrest.

Although the amended information charged, in count one, that Inglin "did intentionally withhold . . . Erich . . . from the court approved physical placement with his legal custodian," and although the trial court began its jury instructions by accurately reading the "withhold" charge from the information, the court then referred to "withhold" only one more time and, without objection from either party, instructed under the "take away" element:

> The first element requires that between June 24, 1995 and August 16, 1996 [sic] Erich Inglin had not attained the age of 18 years. Second element requires that Jill Gennari had legal custody of Erich Inglin under a judgment in an action for divorce. *The third element requires the defendant took away Erich Inglin from Jill Gennari without the consent of Jill Gennari.* "Without consent" means no consent in fact. Such taking need not necessarily be by force or violence.
>
> The fourth element requires the defendant acted intentionally. *"Intentionally" means the defendant acted with the mental purpose to take*

*away the child.* "Intentionally" also requires the defendant knew that Jill Gennari had legal custody of Erich Inglin under a judgment and that Jill Gennari did not consent to take away Erich Inglin.

. . . .

*The fifth element requires the defendant took away Erich Inglin with the intent to deprive Jill Gennari of custody rights.* If you are satisfied beyond a reasonable doubt that between June 24, 1995 and August 16, 1996 [sic] Erich Inglin had not attained the age of 18, that Jill Gennari had legal custody of Erich Inglin under judgment in an action for divorce, *that the defendant intentionally took Erich Inglin away from Jill Gennari without the consent of Jill Gennari, that the defendant knew Jill Gennari had legal custody of Erich Inglin and did not consent to the taking,* and that the defendant acted with intent to deprive Jill Gennari of custody rights, you should find the defendant guilty. If you're not so satisfied, you must find the defendant not guilty.

(Emphasis added.) Following the instructions on count one, the prosecutor and defense attorney corrected the trial court's references to 1996. They did not, however, comment on the trial court's substitution of the "take away" instructions for the "withhold" instructions.[5]

---

[5] At oral argument, the parties expressed their impressions that the trial court's instruction on "take away" rather than "withhold" was simply inadvertent. We have found nothing in the record to suggest otherwise, and we also surmise that the parties' failure to correct the trial court's mistake also was inadvertent.

We note that the pattern jury instruction for § 948.31(1)(b), STATS., Interference with Custody of a Child, delineates only the "take away" instruction. *See* WIS J I—CRIMINAL 2166 (1/89). The 1997 commentary to the jury instruction, however, added this explanation:

## II. ANALYSIS

### A. Count One: § 948.31(1)(b), Stats.

Inglin first argues that because it is undisputed that, on June 13, 1995, he took Erich away *with* his mother's consent, the evidence was insufficient to convict him of "tak[ing] a child away . . . without the consent of the custodian," under § 948.31(1)(b), Stats. He concedes that "[t]he evidence here was sufficient for the jury to convict on the [withholding a child for more than 12 hours] grounds, as in fact was charged in the information," but that "[t]he 'withholds' theory . . . was not before the jury" because, "[w]ithout objection from the state, the jury instructions referred only to the 'takes away' theory."

Recently, the supreme court, reviewing a challenge to the sufficiency of evidence to support a conviction, emphasized the pivotal importance of the jury instructions: "This court should only reverse the conviction if the evidence, after being viewed most favorably to the prosecution, still has insufficient probative value to prove *the theory of guilt submitted to the jury* beyond a reasonable doubt." *State v. Wulff*, 207 Wis. 2d 143, 149, 557 N.W.2d 813, 816 (1997) (emphasis added). In *Wulff*, the court concluded that the

Wis J I—Criminal 2166 is drafted for a case where a taking is involved. Simply substituting "causing a child to leave" for "taking a child away" in the instructions would make it suitable for that type of case. *For a case involving "withholding for more than 12 hours. . .," slightly more substantial modification would be required.*

Wis J I—Criminal 2166 n.1 (1/98) (emphasis added). The problem resulting from the inadvertence in this trial should serve as a reminder to all counsel and courts to carefully review pattern jury instructions before using them.

defendant's attempted second-degree sexual assault conviction could not be affirmed, despite the sufficiency of evidence proving attempted fellatio or attempted sexual contact, because the jury instructions specified only attempted anal or genital intrusion. *See id.* at 151, 577 N.W.2d at 818. Reiterating the basis for its reversal of the defendant's conviction, the court declared, "We can uphold [the defendant's] conviction only if there was sufficient evidence to support guilt *on the charge submitted to the jury in the instructions.*" *Id.* at 153, 557 N.W.2d at 818 (emphasis added).

Inglin argues that *Wulff* controls and, therefore, the conviction on count one must be reversed. The State does not dispute that *Wulff* establishes the standard for review of this issue and, therefore, acknowledges that, regardless of the sufficiency of the evidence on "withhold," this court must focus on whether the evidence was sufficient to support the verdict on "take away." The State argues, however, that because Inglin deceived Gennari about his intentions, and because Gennari consented only to Inglin taking Erich for a vacation, "public policy calls for treatment of the consent here in question as a nullity, affording Inglin no justification for setting aside his conviction."[6]

---

[6] The State also argues that even assuming Gennari's initial consent was not a nullity, she never gave any further consent to "a *second* taking away of Erich" which, the State maintains, took place when Inglin continued to exercise control over Erich twelve hours after the expiration of the period he was allowed to have him. The State contends that "the 'takes a child away' language" of § 948.31(1)(b), STATS.,

means the act of exercising control over the child so removed from the legal custodian's custody for a period in excess of 12 hours, which act is unlawful if done without the guardian's consent; but which is lawful, for the period of exercising control over the child

773

Although we refrain from interpreting or 're-writing' any statute solely to comport with our public policy concerns, *see DeBeck v. DNR*, 172 Wis. 2d 382, 390, 493 N.W.2d 234, 238 (Ct. App. 1992), we do agree with the State's essential argument that, because Inglin's deceit prompted Gennari's permission, the evidence was sufficient to support the jury's "take away" verdict. We reach that conclusion, however, based strictly on the clear language of § 939.22(48), STATS., which provides:

> *"Without consent" means* no consent in fact or that *consent is given for one of the following reasons*:
>
> (a) Because the actor put the victim in fear by the use or threat of imminent use of physical violence on the victim, or on a person in the victim's presence, or on a member of the victim's immediate family; or
>
> (b) Because the actor purports to be acting under legal authority; or
>
> (c) *Because the victim does not understand the nature of the thing to which the victim consents, either by reason of ignorance or mistake of fact* or of law other than criminal law or by reason of youth or

---

consented to by the guardian, if such consent be given. However, if, 12 hours after the expiration of such period, the child has not been returned to the guardian, then the exercise of control over the child by the person who picked up the child from the guardian constitutes, it is submitted, a second "taking away" of the child, i.e., a second exercise of control over the child, in excess of 12 hours, without the guardian's consent. It is obvious, it is submitted, that for such second "taking away" to occur, there is no need for the child to be returned to the guardian, and a second departure from the guardian to occur; the continued exercise of control over the child is the second "taking away," law-violative without the guardian's consent.

Although this theory is intriguing, it is one we need not address in this decision. *See Gross*, 227 Wis. at 300, 277 N.W. at 665.

defective mental condition, whether permanent or temporary.

(Emphasis added.)

Here, clearly, Gennari consented to Inglin taking away Erich *only* because of her understanding of "the nature of the thing to which [she] consent[ed]": a ten day camping trip to Colorado, *after which Erich would be returned to her.* Under § 939.22(48)(c), STATS., Gennari made a "mistake of fact" only because of Inglin's deceit. She remained in "ignorance" of Inglin's true intentions only because of his deceit. Thus, Gennari's agreement allowing Inglin to "take away" Erich was, under § 939.22(48), "without consent."

Our opinion, connected closely to the facts of this case, should not be read to suggest that, in a dispute between two custodial parents, any and every deviation from an agreed-upon visitation or vacation plan would constitute a non-consensual "taking away" under § 948.31(1)(b), STATS. After all, under the words of the statute, to be guilty of violating § 948.31(1)(b), an offender must act "with intent to deprive the [other] custodian of his or her custody rights." Inevitably, countless occasions arise where one custodial parent, responding to unanticipated circumstances, reasonably deviates from agreed-upon plans without violating the criminal law. Indeed, where parents have joint custody, "neither party's legal custody rights are superior, except with respect to specified decisions as set forth by the court or the parties in the final judgment or order," § 767.001(1s), STATS. (defining "Joint legal custody"), and each parent has "the right and responsibility to make major decisions concerning the child, except with respect to specified decisions as set forth by the court or the parties in the final judgment or order," § 767.001(2)(a), STATS. (defining "Legal custody").

■ Here, however, Inglin's violation of his agreement with Gennari could not have been more immediate, complete, or indicative of his "intent to deprive [Gennari] of . . . her custody rights," *see* § 948.31(1)(b), STATS. From the moment of his "taking away" Erich, Inglin never intended to do what he had agreed to do; he never intended to return Erich to Gennari. Therefore, although an offense like this one certainly is more logically prosecuted, as the State obviously intended, as a "withholding" rather than a "taking away," the evidence in this case still was sufficient to support Inglin's conviction for "taking away" Erich without his mother's consent.[7]

### B.   Count Two: § 948.31(3)(a), STATS.

Inglin next challenges the sufficiency of the evidence to support his conviction on count two. As charged in the amended information, that count alleged: "Between June 24, 1995, and August 16, 1995,

---

[7] We acknowledge that, in the context of this case, it is difficult to reconcile the words of § 939.22(48), STATS., with those of the Legislative Council Comment to § 939.22(48), on which Inglin relies: "A misconception resulting from false promises on the part of the actor is not included in this general definition but is specifically made a part of some crimes such as stealing." We must not, however, permit a statutory commentary to somehow supersede the clear words of a statute, particularly where to do so would defy common sense. *See Mullen v. Coolong*, 132 Wis. 2d 440, 449, 393 N.W.2d 110, 114 (Ct. App. 1986) ("Using legislative council comments to override legislation is improper because those notes are but another form of legislative history 'to be resorted to in cases of ambiguity.' "), *overruled on other grounds by Nicholson Home Ins. Cos.*, 137 Wis. 2d 581, 600–01, 405 N.W.2d 327, 334–35 (1987).

in the Village of Shorewood, Milwaukee County, Wisconsin [Inglin] did intentionally conceal a child . . . from the other parent, contrary to Wisconsin Statutes Section 948.31(3)(a)." Inglin argues that because "[i]t was uncontroverted . . . that [he] and Erich were outside the State of Wisconsin during that entire period of time" charged in count two, "the 'concealment' . . . occurred wholly outside the state" and, therefore, "Wisconsin lacked territorial jurisdiction over that offense."[8] We disagree.

---

[8] At oral argument, and in supplemental briefs following that argument, the parties have vigorously argued whether Inglin waived this issue by failing to specifically raise it in the trial court. The parties essentially agree that a challenge to personal jurisdiction may be waived, but that a challenge to territorial jurisdiction may not be waived. Thus, they debate whether § 939.03, STATS., relates to personal or territorial jurisdiction. Inglin maintains that, despite the supreme court's decision in *State v. Smith*, 131 Wis. 2d 220, 239–40, 388 N.W.2d 601, 610 (1986), and this court's decision in *State v. West*, 214 Wis. 2d 468, 481–83, 571 N.W.2d 196, 201 (Ct. App. 1997), the statute addresses territorial jurisdiction; the State responds that *Smith* and *West* clearly establish that § 939.03 relates to personal jurisdiction and, therefore, that Inglin waived his challenge.

Neither Wisconsin's statutes nor case law has definitively distinguished territorial jurisdiction from personal jurisdiction. Some other states have done so. *See, e.g., State v. Luv Pharmacy, Inc.*, 388 A.2d 190 (N.H. 1978) (challenges to personal and territorial jurisdiction). In this case, however, we need not resolve the waiver issue because, if we were to conclude that Inglin waived this challenge, we would reach the merits anyhow, through his ineffective assistance of counsel claim. Thus, we directly address his jurisdictional challenge.

Whether a court has jurisdiction presents an issue of law, which we review *de novo. See State v. Webster*, 196 Wis. 2d 308, 316, 538 N.W.2d 810, 813 (Ct. App. 1995). "It is elementary that a court may act only upon crimes *committed* within the territorial jurisdiction of the sovereignty seeking to try the offense." *Hotzel v. Simmons*, 258 Wis. 234, 240, 45 N.W.2d 683, 686 (1951) (emphasis added). Without jurisdiction, criminal proceedings "are a nullity." *Id.* at 241, 45 N.W.2d at 687. For purposes of jurisdictional analysis under our statutes, however, the *commission* of a crime is not established solely by the location of the offender. *See* § 939.03, STATS. [9]

Section 939.03(1)(c), STATS., provides: "A person is subject to prosecution and punishment under the law of this state if: While out of this state, the person does an act with intent that it cause in this state *a consequence* set forth in a section defining a crime." (Emphasis added.) Thus, if Inglin, while in Canada, intended that his concealment of Erich would, in Wis-

---

[9] Section 939.03, STATS., provides:

**939.03 Jurisdiction of state over crime. (1)** A person is subject to prosecution and punishment under the law of this state if:

    (a)   The person commits a crime, any of the constituent elements of which takes place in this state; or

    (b)   While out of this state, the person aids and abets, conspires with, or advises, incites, commands, or solicits another to commit a crime in this state; or

    (c)   While out of this state, the person does an act with intent that it cause in this state a consequence set forth in a section defining a crime; or

    (d)   While out of this state, the person steals and subsequently brings any of the stolen property into this state.

    **(2)**   In this section "state" includes area within the boundaries of the state, and area over which the state exercises concurrent jurisdiction under article IX, section 1, of the constitution.

consin, cause *a consequence* prohibited by § 948.31(3)(a), STATS., then Wisconsin had jurisdiction.

As the trial court correctly instructed the jury, " 'Conceal' means to hide the child or do something else *which prevents or makes more difficult the discovery of the child by the other parent.*" WIS J I—CRIMINAL 2168 (emphasis added). Unquestionably, every day Inglin kept Erich in Canada, he *prevented* Erich's lawful return to Gennari, and he *made more difficult the discovery* of Erich by Gennari. Therefore, for purposes of jurisdictional analysis, Inglin's concealment of Erich in Canada was inseparable from the *consequences* of that concealment in Wisconsin.

Our conclusion is consistent with the Wisconsin Supreme Court's decision in a case presenting an analogous situation, and with other states' decisions in cases involving situations essentially the same as we have here. In *Poole v. State*, 60 Wis. 2d 152, 208 N.W.2d 328 (1973), the defendant, appealing his conviction for nonsupport, argued that Wisconsin lacked jurisdiction because "his residence and the residence of his family at the time of the alleged act of abandonment and non-support was Arizona and not Wisconsin" and, therefore, "[h]is family's subsequent removal to Grant [C]ounty, Wisconsin . . . did not confer jurisdiction upon the courts of that county for an act not committed within its borders." *Id.* at 155, 208 N.W.2d at 330. Based on § 939.03(1)(c), STATS., however, the supreme court rejected the defendant's claim, concluding that "a person may be prosecuted for doing an act outside this state which has *a criminally proscribed*

*consequence within the state." Id.* at 156, 208 N.W.2d at 331 (emphasis added).[10]

In many cases involving the concealment of children, courts, rejecting jurisdictional challenges comparable to the instant one, have focused on the *consequences* within their jurisdictions of actions taken elsewhere. For example, in *Wheat v. State,* 734 P.2d 1007 (Alaska Ct. App. 1987), the Alaska Court of Appeals concluded that, despite the fact that the defendant was located in Arizona throughout the period he committed the crime of child custodial interference, Alaska had jurisdiction because the defendant's conduct produced a critical result in Alaska:

> In many instances, of course, a crime is completed upon commission of the last element of the required actus reus. Where, however, a statute, in addition to

---

[10] Inglin argues that *State ex rel. N.R.Z. v. G.L.C.,* 152 Wis. 2d 97, 447 N.W.2d 533 (1989) "seriously undermines any suggestion that *Poole* [*v. State,* 60 Wis. 2d 152, 208 N.W.2d 328 (1973)] remains good law" or, if it remains good law, that "it does not control here." *N.R.Z.,* however, is wholly distinguishable.

Never mentioning *Poole, N.R.Z.* addressed an issue of personal jurisdiction in a civil paternity action—whether the defendant had sufficient contacts with Wisconsin to warrant Wisconsin's exercise of jurisdiction over his nonresident person. *See N.R.Z.,* 152 Wis. 2d at 107–08, 447 N.W.2d at 536–37. By contrast, *Poole,* like the instant case, addressed an issue of jurisdiction in a criminal case and, rejecting essentially the same argument Inglin presents, concluded that § 939.03(1)(c), Stats., conferred Wisconsin jurisdiction for prosecution of "an act" committed " 'with intent that it cause in this state a consequence set forth in a section defining a crime.' " *Poole,* 60 Wis. 2d at 156, 208 N.W.2d at 331 (quoting § 939.03(1)(c)). *See also State v. Gantt,* 201 Wis. 2d 206, 209, 548 N.W.2d 134, 135 (Ct. App. 1996).

prohibiting conduct, includes within its definition of the offense a specific result, then the crime is not completed until that result occurs. And if the prohibited result occurs in a place other than the conduct which occasioned it, the location of the result may fairly be deemed the place where the crime is "consummated."

*Id.* at 1009. In *Trindle v. State*, 602 A.2d 1232 (Md. 1992), Maryland's highest court, quoting these very words of *Wheat* in a comparable case, reached the same conclusion. *See id.* at 1236.

Similarly, in *State v. Doyen*, 676 A.2d 345 (Vt. 1996), the Vermont Supreme Court rejected the jurisdictional challenge of a defendant convicted of interfering with child custody. Citing numerous decisions from throughout the country, the court explained:

The cases identify two possible bases for jurisdiction over a charge of custodial interference. One approach is to consider a defendant's failure to return a child to the child's lawful custodian a crime of omission occurring in the lawful custodian's state of residence. An alternative ground for jurisdiction is the recognition that *a state may impose criminal sanctions for out-of-state conduct that has a detrimental effect within the state.*

. . . .

. . ."Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."

. . . .

The Wyoming Supreme Court, inquiring whether "any [other] jurisdiction . . . would have taken an interest in pursuing [the defendant's]

unlawful conduct," concluded that "the initiative to pursue the matter could only be found where the mother, who was entitled to custody, lives." We are equally skeptical that Hawaii or California or any other state where defendant sojourned with his daughter would have cared to prosecute him for his conduct. *The harm occurred in Vermont, and Vermont is the proper state to pursue the prosecution.*

*Id.* at 347–50 (quoting *Strassheim v. Daily*, 221 U.S. 280, 284–85 (1911), and *Rios v. State*, 733 P.2d 242, 250 (Wyo. 1987) (citing and relying on rationale of *Poole*)) (emphasis added; citation omitted; alterations in *Doyen*).[11]

---

[11] Many other jurisdictions have looked to our supreme court's analysis in *Poole v. State*, 60 Wis. 2d 152, 208 N.W.2d 328 (1973), as support for their conclusion that their states have jurisdiction over defendants in nonsupport or interference with child custody cases, irrespective of whether the defendant-parent committed the offense while located in another state or county. *See, e.g., State v. Shaw*, 539 P.2d 250, 252 (Idaho 1975) (concluding Idaho court had jurisdiction to try Nevada resident for nonsupport of his minor children who resided in Idaho); *Rios v. State*, 733 P.2d 242, 247 (Wyo. 1987) (finding that Wyoming had subject-matter jurisdiction to prosecute father for failing to return child to custodial parent in Wyoming when at the time the crime was committed neither the child nor the father had been in Wyoming); *People v. Caruso*, 504 N.E.2d 1339, 1343 (Ill. App. Ct. 1987) (concluding that Illinois' statute on "criminal jurisdiction is broad enough to reach conduct of an accused occurring outside Illinois' territorial limits in violation of the child-abduction statute"); *State v. Taylor*, 625 N.E.2d 1334, 1336 (Ind. Ct. App. 1993) (concluding that nonresident parent may be prosecuted in Indiana for the criminal offense of his nonsupport of his children who live in Indiana); *State v. Paiz*, 817 S.W.2d 84, 86 (Tex. Crim. App. 1991) (rejecting defendant's contention that the Sixth Amendment's vicinage provision, which guarantees a criminal trial "by an impartial jury of the

These decisions are sound; in Wisconsin, their rationale gains additional support from our statutes and from *Poole*. Accordingly, we conclude that: (1) as noted, under § 948.31(3)(a), STATS., the element of concealment includes the intent to "prevent[ ] or make[ ] more difficult the discovery of the child by the other parent," *see* WIS J I—CRIMINAL 2168; and (2) preventing or making such discovery more difficult produces "a consequence" under § 939.03(1)(c), STATS., and is "an act outside this state which has a criminally proscribed consequence within the state." *Poole*, 60 Wis. 2d at 156, 208 N.W.2d at 331. Therefore, on count two, Wisconsin had jurisdiction.

## C. Affirmative Defense

Inglin also argues that the trial court committed reversible error when it denied his request to offer an affirmative defense—that he believed his actions were necessary to protect Erich from emotional harm. The record reveals, however, that the trial court never foreclosed Inglin from presenting any evidence of emotional harm or, as Inglin requested, from establishing a link between emotional harm and physical harm.

Just prior to jury selection, counsel for Inglin advised the trial court of his desire to present an affirmative defense under § 948.31(4), STATS.[12] He

State and district wherein the crime shall have been committed," was violated when he was tried for the crime of nonsupport where his child resided rather than where he resided).

[12] Section 948.31(4), STATS., provides:

(a)   It is an affirmative defense to prosecution for violation of [offenses under § 948.31, STATS.] if the action:

1.   Is taken by a parent or by a person authorized by a parent to protect his or her child in a situation in which the parent or

explained, however, that the theory of defense would move beyond the statute's reference to physical harm or sexual assault:

> But I would ask the court to at least interpret physical harm as emotional, that could result potentially in physical harm, too, because that's just I think an oversight on the drafters of some of these statutes. What is physical harm? I think it can manifest itself vis-à-vis an emotional state and that's really what Mr. Inglin's defense is.

Inglin acknowledges that, in *State v. McCoy*, 143 Wis. 2d 274, 421 N.W.2d 107 (1988), the supreme court held that the terms of the affirmative defense under § 948.31(4)(a)1, STATS., do not encompass emotional harm. *See id.* at 294, 421 N.W.2d at 114. He argues, however, "the *McCoy* Court did not address either the remaining affirmative defenses" under § 948.31(4)(a), STATS., or the effect of § 948.04(2), STATS., which provides:

> A person responsible for the child's welfare is guilty of a Class C felony if that person has knowledge that another person has caused, is causing or will cause mental harm to that child, is physically and emotionally capable of taking action which will prevent harm, fails to take that action and the failure to act exposes the child to an unreasonable risk

authorized person reasonably believes that there is a threat of physical harm or sexual assault to the child;

    2. Is taken by a parent fleeing in a situation in which the parent reasonably believes that there is a threat of physical harm or sexual assault to himself or herself;

    3. Is consented to by the other parent or any other person or agency having legal custody of the child; or

    4. Is otherwise authorized by law.

    (b) A defendant who raises an affirmative defense has the burden of proving the defense by a preponderance of the evidence.

of mental harm by the other person or facilitates the mental harm to the child that is caused by the other person.[13]

Thus, although he did not present this exact argument to the trial court, Inglin now contends that, under § 948.31(4)(a)4, the obligation to protect Erich against "mental harm" established a separate basis for his affirmative defense and, therefore, his actions were "otherwise authorized by law," under § 948.04(2).[14] He further argues that "permitting [him] to defend on such grounds also is required as a matter of due process." *See United States v. Cardiff*, 344 U.S. 174, 176–77 (1952) (in prosecution for defendant's refusal to permit federal inspectors to enter and inspect premises of apple processing factory, statute denied "fair and effective notice" where other statute "apparently gave him the right to withhold" permission).

Responding to counsel's request "to at least interpret physical harm as emotional," the trial court concluded:

> So I'm going to limit you to physical harm. I will not include emotional harm or at least when I give the final instructions to the jury, I will tell them

---

[13] As Inglin points out, the effect of § 948.04, STATS., could not have been considered by the supreme court in *State v. Mc Coy*, 143 Wis. 2d 274, 421 N.W.2d 107 (1988), because the statute was enacted subsequent to the *McCoy* decision. *See* 1987 Wis. Act 332, § 55, eff. July 1, 1989.

[14] At oral argument before this court, the State contended that Inglin's argument must fail if only for the reason that Inglin attempted to pursue a defense based on *emotional* harm while § 948.04(2), STATS., refers to *mental* harm. Although that distinction may assume some significance under other circumstances, for purposes of this appeal we equate emotional and mental harm.

that the threat has to be of physical harm. I won't allow them to consider emotional harm. *There may be some overlap here, and . . . I'll try to be as liberal as possible in allowing the testimony in,* but I'm going to limit it to that. *I have to hear the testimony before I rule.* I'm just saying basically that's the law, that's the testimony I want to hear. *There may be some overlap and I may allow it,* but basically that's going to be the ground rules.

(Emphasis added.) We have examined the record carefully and note: (1) In his opening statement, defense counsel stated, *inter alia:*

[Inglin] also noticed certain physical *and emotional* problems about his son, and he's going to tell you about what he experienced with his son. And really, as a father to his son, he noticed things that either the mother didn't notice or didn't want to notice. And he'll explain to you why he took the actions that he did, and what you're going to hear is about a man who loves his son and is willing to do whatever it takes to protect his son.

(Emphasis added.) (2) Inglin testified, without a single objection from the State, and without the exclusion of any of his testimony, about what he believed to be the physical and emotional harm from which he was protecting Erich.[15] (3) Several times during the course of

---

[15] Inglin's evidence relating to physical and emotional harm consisted solely of his testimony, virtually all of which was disputed by the State's rebuttal witnesses. His assertions, spaced throughout his testimony, are as follows, in the order he offered them:

From the time that I got back visitation at the end of that September [1994], from that point on I wasn't the same person because every day of my life was filled with dread that Erich would be harmed.

his testimony, Inglin answered open-ended questions about any "other problems" or "other things," without limitation to physical harm, that had caused him con-

> Jill has a demonstrated history of violence. She was arrested twice for domestic violence. She's—she hit me with a bottle over the head. She's thrown things at me. She's done the same thing to the children. She's exhibited that behavior both in front of me and others. And I felt that she had shown that type of behavior to Erich numerous times and that it was a danger to him. To be in that type of situation.

Responding to the question, "And did you believe that your son was in danger?" Inglin testified:

> I had made a vow to myself that if Erich asked to see his mother, that I would return him and I would have kept that vow. Erich was completely at ease with me and he grew healthy and strong. He was never sick when he was with me.
>
> Well one of the main concerns I had was the problem with sleep deprivation. Erich was continually tired. He had circles under his eyes. People noticed it, and the problem was he wasn't able to sleep properly. I spoke to him a lot about that. He told me ... that his mama gave him Coca Cola to keep him up. . . . I had mentioned sleep problems from the start to the guardian [ad litem], and they were always dismissed as either unprovable or I couldn't claim it was she doing it or myself doing it. No, I did not take him to the physician, I knew what the problem was, he needed rest.

Responding to the question, "What other problems did you find with Erich between October of '94 and May of 95?" Inglin testified:

> During that period of time, I was walking on eggshells. So even if Jill had done something to disregard the [placement] schedule, I would have simply accepted it because I didn't want any further trouble.
>
> [Erich] told me that he was put into a plastic bag by Buddy, who was Jill's boyfriend. . . . And Jill made both of them stand in the corner for punishment.
>
> And Erich told me that he was locked into the bedroom with Buddy naked, and I asked him why does that happen, and he said because mama wants Buddy to be my new father.

Finally, under cross-examination, Inglin had this exchange with the prosecutor:

787

cern or had led him to take away and conceal Erich. (4) Inglin never claimed, either during the trial or at the close of evidence, that he had been denied the opportunity to present evidence linking physical and emotional harm. (5) In closing argument, defense counsel, without any objection from the State or restriction by the trial court, maintained that Inglin had "given you his explanations for what he has done, the fear of his son's physical harm, and that's what he feared and that's why he did what he did."

At oral argument, Inglin's appellate counsel clarified that he was not arguing that trial counsel was ineffective for failing to put forward additional evidence of emotional harm in an offer of proof. *See* § 901.03(1)(b), STATS. Rather, he asked that we con-

Q: What other problems did you observe with Erich between October of '94 and May of '95?

A: He didn't like going home.

Q: Didn't like going home. When you say "home," I presume you mean to his mother's house.

A: Yes.

Q: Okay. And what made you believe he didn't like going home?

A: His actions.

Q: Like what?

A: Clinging to me.

Q: So you claim he . . . clung to you. Correct?

A: That's correct.

Q: Okay. What else, what other things did you observe that appeared to be a threat to his health and safety?

A: I don't recall any others.

Additionally, Inglin reiterated a number of these assertions when further questioned about them, and, at several junctures, he asserted that Gennari had shaved Erich's head and, in so doing, had punished both Erich and him because "it devastated me."

788

sider Inglin's trial testimony as support for the requested affirmative defense. We have done so.

Although Inglin has presented an intriguing due process theory based on the potential interplay of § 948.04(2), STATS., and § 948.31(4)(a), STATS., we conclude that the trial record does not support his premise—that he was denied the opportunity to present his requested affirmative defense. The trial court's initial ruling was a flexible one, acknowledging the possible overlap between physical and emotional harm, and allowing for further consideration of specific evidence. Inglin's testimony apparently reached every area of his concern about Erich, both physical and emotional. The State never objected, and the trial court never excluded any of Inglin's assertions. And although the trial court provided the standard instruction on the affirmative defense under § 948.31(4)(a)1, STATS., that "physical harm" instruction did not preclude the possibility of an overlap between physical and emotional harm.[16]

---

[16] The trial court instructed, in part:

If you are satisfied beyond a reasonable doubt that the defendant intentionally concealed or intentionally withheld a child from a court approved physical placement with his legal custodian, you must consider whether this action taken by the defendant was done with reasonable belief that there was a threat of physical harm to the child.

Wisconsin law provides that it is a defense to these crimes if the action taken was done with reasonable belief that there was a threat of physical harm to the child.

The burden is on the defendant to satisfy you to a reasonable certainty by the greater weight of the credible evidence that the child, Erich Inglin, was intentionally concealed and/or intentionally withheld with the reasonable belief that there was a threat of physical harm to the child.

Moreover, under § 948.31(4)(b), STATS., Inglin had the burden of proving his affirmative defense.[17] But Inglin never testified that he took Erich away or concealed him in order to comply with § 948.04(2), STATS. Thus, no evidence supports Inglin's theory on appeal that, because of the need to comply with § 948.04(2), he took actions that were "otherwise authorized by law," under § 948.31(4)(a)4. Therefore, we conclude that Inglin was not denied due process or any theory of defense supported by the evidence.

*By the Court.*—Judgment and order affirmed and cause remanded with directions.

---

[17] Section 948.31(4)(b) STATS., states, "A defendant who raises an affirmative defense has the burden of proving the defense by a preponderance of the evidence."