**Ronn B. PERRIN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7696.

Court of Appeals of Alaska.

March 21, 2003.

17. AS 13.36.245; AS 13.36.250.

18. Op. on Reh'g at 16–17.

20. Emphasis added.

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Ben M. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

In *Gerlach v. State*,[1] we upheld the superior court's refusal to instruct the jury on Gerlach's claimed necessity defense to a charge of first-degree custodial interference.[2] In this case, on the eve of trial, the State moved to bar Ronn B. Perrin from presenting a necessity defense relying on *Gerlach*. Perrin disclaimed any reliance on the affirmative defense of necessity; even so, the superior court requested a summary of Perrin's defense.

After hearing the summary, the court reasoned that Perrin's proffered testimony was a necessity defense and announced that Perrin's "defense" was barred by *Gerlach*. Because we conclude the superior court applied *Gerlach* too broadly, we reverse.

*Facts and proceedings leading to the court's Gerlach-based ruling*

B.C. is Perrin's daughter, but Perrin was not married to B.C.'s mother. In 1997, Perrin filed an action to establish his paternity of B.C. and obtain joint custody. After a custody trial in January 1998, the superior court granted joint legal custody of B.C. to Perrin and B.C.'s mother, primary physical custody to B.C.'s mother, and set a visitation schedule for Perrin.

During the summer of 1999, Perrin had court-ordered visitation with B.C. on Wednesday evenings and two out of every three weekends. On Sunday, May 15, 1999, when Perrin did not return B.C. as scheduled, B.C.'s mother called Perrin's cousin, Don Perrin. She discovered that Don had received a call from a relative in California, telling him to pick up Perrin's truck at the airport. B.C.'s mother contacted the Alaska State Troopers and reported that B.C. was missing.

---

1. 699 P.2d 358 (Alaska App.1985).

2. AS 11.41.320(a).

About one week later, Don Perrin received a power of attorney in the mail from California from Perrin. The power of attorney gave Don Perrin authority over Perrin's residence, automotive repair business, and all his personal possessions.

The Alaska State Troopers tracked Perrin down through a phone number they found on a notepad at his business. The Troopers learned Perrin had stayed with a friend near San Diego, but had since left. On June 26, 1999, B.C.'s mother received a letter in Perrin's handwriting from San Diego. The letter read: "Everyone is fine, safe, healthy and *happy.*"

On August 3, 1999, the FBI located Perrin in Oklahoma. Perrin had dyed his hair. Perrin was arrested and charged with first-degree custodial interference, a class C felony.[3]

Before jury selection on the day of Perrin's trial, the State moved to prevent Perrin from raising a necessity defense.[4] The State argued that *Gerlach* precluded a necessity defense in custodial interference cases. Arguing that a necessity defense was unavailable, the State maintained that Perrin was precluded from giving his reasons for taking B.C. out of the state and describing his actions while out-of-state.

Perrin replied that he would not offer a necessity defense. He stated that he expected to present evidence to counter the element of custodial interference that requires the defendant have the requisite "intent to hold the child ... for a protracted period."[5]

At this point, Superior Court Judge Eric Smith asked Perrin to give him, in a "nutshell," an offer of proof on his defense strategy. Perrin did so and described his relationship with B.C.'s mother, his concerns after B.C. complained to him that she was physically abused by her mother's companion, what led up to his departure from Alaska with B.C., and what he did to prepare to

return to Alaska with B.C. before he was arrested.

Following this proffer, Judge Smith reviewed this court's decision in *Gerlach.* Judge Smith concluded that *Gerlach* holds that self-help is not an acceptable defense for custodial interference and "allowing self-help to be brought in to demonstrate lack of intent essentially establishes the necessity defense without calling it that." The judge "had a lot of trouble with" the fact that Perrin was out-of-state with B.C. for two and one-half months and intended to keep her out-of-state for as long as four months. Judge Smith said that the time frame could not be viewed as anything but prolonged because Perrin "actually attempted to establish sufficient residence and job for purposes of getting California family services involved" and "attempt[ed] to stay ahead of the FBI[.]"

Judge Smith granted the State's motion and ordered Perrin not to present any evidence to the jury relating to the actions he took while out of state to prepare to raise the issue when he returned to Alaska. The judge admitted that he was "not comfortable depriving a defendant ... of his ability to defend against the intent [element.]"

Following this ruling, Perrin said that a jury trial, without the ability to present a defense, would be a "waste of judicial resources." Judge Smith suggested that Perrin could obtain appellate review of his ruling by having a bench trial. Because the court and the parties viewed the court's ruling barring Perrin's defense testimony as non-dispositive, they concluded that a *Cooksey*[6] plea was not available. After a recess, Perrin's attorney told the court that his client would agree to waive his right to a jury trial and proceed with a bench trial. The court dismissed the jury and proceeded to opening statements without addressing Perrin personally and asking if he understood the

---

**3.** AS 11.41.320(b).

**4.** AS 11.81.320.

**5.** AS 11.41.330(a).

**6.** *See Cooksey v. State,* 524 P.2d 1251, 1255–57 (Alaska 1974). In *Cooksey,* the Alaska Supreme Court established a procedure permitting a defendant to plead no contest and still preserve an issue for appeal, so long as the issue was dispositive of the defendant's case. *Id.*

rights he would lose if he proceeded with a court trial.[7]

*Does Gerlach bar Perrin's proffered testimony?*

In *Gerlach*, a mother left Alaska with her daughter and hid in Washington State for over one year. The mother was arrested and convicted of first-degree custodial interference at trial.[8]

Before trial, Gerlach made an offer of proof supporting her plan to present a necessity defense.[9] Gerlach said she would testify that she believed the child's father was not properly caring for the child because the child had a vaginal infection, was dirty and unkempt, and, also, that the father beat his children from a previous marriage.[10] Gerlach claimed she held the child out-of-state because she had little faith in the judicial system and feared she would run out of money before a custody dispute was resolved.[11] Gerlach had witnesses available to testify about the father's abuse of the child.[12] Gerlach maintained the purpose of this testimony was to show her state of mind and her fear of imminent harm to her daughter. The trial judge ruled that Gerlach's offer of proof was insufficient as a matter of law such that he could not instruct the jury on the necessity defense. He also precluded her from raising that defense at trial.[13]

We upheld the superior court's ruling for two reasons. First, we held that Gerlach's claim failed to meet an essential prong of a necessity defense: the harm caused by the

defendant's conduct must not be disproportionate to the harm avoided.[14] In addition, we concluded that Gerlach had remedies at law she did not utilize.[15] We recognized that the legislature has established remedies to protect vulnerable children and has adopted procedures for resolving child custody disputes.[16]

A person commits the crime of first-degree custodial interference if the person commits second-degree custodial interference and also causes the child to be removed from or kept out of this state.[17] To commit second-degree custodial interference, a defendant must be the relative of a child under 18 and, knowing that they have no right to do so, takes, entices, or keeps the child from its lawful custodian with the intent to withhold the child for a protracted period.[18] Custodial interference is a continuing offense.[19] Thus, to convict a defendant for custodial interference the State must prove a defendant committed the actus reus, "the act of taking, enticing, or keeping a child from a lawful custodian with 'no legal right to do so,' with the necessary mental state, knowing that he or she has no legal right to take the child and intending to keep the child for a protracted period." [20]

In his offer of proof, Perrin conceded that he removed B.C. from Alaska. He also did not dispute that he knew retaining B.C. violated the custody order. Thus, the element in dispute when the superior court considered the State's motion was whether Perrin intended to withhold B.C. from her lawful custodian for a protracted period.

---

7. In *Walker v. State*, 578 P.2d 1388 (Alaska 1978), the Alaska Supreme Court ruled that the superior court must address a defendant personally to obtain a waiver of jury. We followed *Walker* in *McGlauflin v. State*, 857 P.2d 366, 369 (Alaska App.1993), and ruled that "the record must explicitly demonstrate that the defendant understood and personally relinquished the right to trial by jury."

8. *Gerlach*, 699 P.2d at 359, 360.

9. *Id.* at 359.

10. *Id.*

11. *Id.*

12. *Id.* at 360.

13. *Id.*

14. *Id.* at 361.

15. *Id.* at 362.

16. *Id.* at 362–63.

17. AS 11.41.320(a).

18. AS 11.41.330(a).

19. *Gerlach*, 699 P.2d at 362.

20. *See Vachon v. Pugliese*, 931 P.2d 371, 377 (Alaska 1996), quoting *Strother v. State*, 891 P.2d 214, 223 (Alaska App.1995).

Perrin argued evidence of his conduct and objectives during the alleged continuing offense was admissible to undercut the State's burden of proof on the element of whether Perrin intended to withhold B.C. for a protracted period.

After Perrin's proffer, the superior court ruled as follows:

> *The Court:* My concern is that by essentially allowing self-help to be brought in to demonstrate lack of intent essentially establishes the necessity defense without calling it that. And that the telling the jury, well, you're only to look at this for intent, really is the same as telling—I mean, I guess maybe the burden of proof's a little different. I don't know. But essentially the jury is being given the same defense in another guise. So I think, based on the defendant's offer of proof, there isn't enough for me to find that ... the jury be informed of those particular reasons for running. I recognize that this may well straitjacket the defendant's case. I don't know if it will or not. It certainly deprives him of one key thing he wanted to explain. But it seems to me that this is just the *Gerlach* case all over again.

Perrin's attorney asked if the court was "ordering us not to address the issue as to what my client did to, while he was out of state, to assist him in bringing what he perceived to be abuse to the forefront, or to get help as to that issue[?]" The court responded: "I don't see how I can let it in without making this a necessity defense.... Given the *Gerlach* opinion, I don't see I have much choice."

Shortly after this exchange, the jury was discharged and the case proceeded to a court trial. Judge Smith found that the State proved beyond a reasonable doubt that Perrin had the intent to withhold B.C. for a protracted period of time. Judge Smith found Perrin guilty of first-degree custodial interference.[21]

The Alaska Constitution accords criminal defendants a constitutional right to testify in their own behalf. In *Hughes v.*

*State,*[22] the Alaska Supreme Court observed that a defendant's right to testify in his own defense is of such fundamental importance that "[n]o defendant requesting to testify should be deprived of exercising that right and conveying his version of the facts to the court or jury[.]"[23]

Perrin disavowed any reliance on a necessity defense. Perrin planned to present evidence that described his conduct and his objectives while he was withholding B.C. from her lawful custodian. As part of its burden of proof, the State was required to prove that Perrin's conscious objective while he was withholding B.C. was to withhold her for a protracted period. Even though Perrin's proffer contained evidence that might aid the State in meeting its burden of proof, Perrin's testimony denying that he had the conscious objective to withhold B.C. for a protracted period and describing his conduct is relevant. In fact, during the court trial, Perrin testified at length about his actions and his state of mind when he left the state and while he was out-of-state.

Moreover, even though the court was concerned that Perrin's strategy was to claim necessity without meeting the requirements of that affirmative defense, under the reasoning of *Gerlach,* the court could have instructed the jury that Perrin would have to avail himself of available legal remedies before undertaking unlawful self-help.[24]

However, after the superior court announced its ruling after Perrin proffered his evidence, the jury was discharged in apparent reliance on that ruling, leading to a court trial where Perrin actually testified to much that he proffered before the court's ruling.

We have not ruled that the testimony of the other witnesses Perrin planned to call at his jury trial is admissible. We hold only that the superior court erred when it announced that it would bar Perrin's testimony. As with any testimony, the testimony of other witnesses must be admissible under the normal rules of evidence.

**21.** AS 11.41.320(a).

**22.** 513 P.2d 1115 (Alaska 1973).

**23.** *Id.* at 1119.

**24.** *See Gerlach,* 699 P.2d at 362.

This decision does not impose any additional burden of proof on the State. The State retains the burden to prove to the trier of fact that Perrin intended to withhold B.C. for a protracted period. And Perrin is entitled to take the stand and testify that he did not have the conscious objective to withhold B.C. for a protracted period, even if Perrin's proffered testimony might not appear plausible in the circumstances of his case. Perrin's conviction must be reversed. Under the circumstances of this case, Perrin is entitled to a jury trial.[25]

*Conclusion*

The judgment of the superior court is REVERSED.

COATS, Chief Judge, concurring.

To me this case turns on the premise that a defendant has a constitutional right to a jury trial. Under our system of government the legislature has the authority to pass laws. At trial the judge has the duty to tell the jury what the law is. It is the jury's job to determine if the defendant violated the law. In my view Perrin was entitled to have a jury determine whether he committed the crime of custodial interference.

A person commits the crime of custodial interference if, knowing that he lacks the authority to do so, he takes or keeps a child from a lawful custodian "with intent to hold the child . . . for a protracted period."[1]

Perrin's defense was that he did not intend to hold his daughter, B.C., for a protracted period of time. According to Perrin, he believed that his daughter was being physically abused and that his only option was to keep B.C. until he could obtain help to prevent the abuse. Perrin claimed his intent was not to abscond with B.C. or to be gone for a protracted period of time. He told Judge Smith

that the longest period of time he intended to keep B.C. away was three or four months. His intent was to seek help to stop the abuse. Judge Smith ruled that, even if a jury believed Perrin's defense, Perrin would be guilty of custodial interference as a matter of law because the time that Perrin had been gone was a "protracted period ." He therefore told Perrin that he would not allow Perrin to present this evidence in a jury trial. Perrin subsequently waived his right to a jury trial based upon Judge Smith's ruling that he would not be able to present the reasons why he left with B.C. and to explain why he was gone for so long.

Judge Smith based his ruling on our decision in *Gerlach v. State*,[2] which involved the offense of custodial interference. But I see significant distinctions between *Gerlach* and this case. Gerlach's former husband had custody of her daughter Angela.[3] Gerlach had visitation rights.[4] Gerlach and her former husband were involved in an ongoing custody dispute.[5] Gerlach offered to testify "that she had little faith in judicial proceedings as a means for resolving custody disputes."[6] She was concerned that the judge would rule against her.[7] She accordingly fled with her daughter to another state where she hid for over a year.[8] From Gerlach's offer of proof it appears that she intended to hide her daughter from her former husband and the authorities for as long as possible. She never testified that she had any intent to resolve the custody problem other than by keeping her daughter away from her former husband.

Gerlach attempted to raise the defense of necessity. The defense of necessity is an affirmative defense where the defendant must show that the act charged was done to prevent a significant evil, that there was no adequate alternative, and that the harm

**25.** *See Strane v. State*, 16 P.3d 745, 753 (Alaska App.2001), *rev'd on other grounds*, 61 P.3d 1284 (Alaska 2003).

**1.** AS 11.41.330(a).

**2.** 699 P.2d 358 (Alaska App.1985).

**3.** *Id.* at 359.

**4.** *Id.*

**5.** *Id.*

**6.** *Id.*

**7.** *Id.* at 359–60.

**8.** *Id.* at 359.

caused was not disproportionate to the harm avoided.[9] Where a defendant has an adequate remedy at law, she is not entitled to the defense.[10] The trial judge ruled that Gerlach was not entitled to present the defense of necessity.[11] After she was convicted, Gerlach appealed. We concluded that the trial judge did not err in entering a protective order that precluded Gerlach from raising the necessity defense at trial.[12]

It is generally difficult for a defendant to establish a necessity defense. And there are many decisions in which appellate courts have upheld the trial court's refusal to instruct on the necessity defense.[13] Gerlach had a difficult case for claiming necessity. She had a remedy at law—she was involved in an ongoing custody battle in court. She thought she was going to lose. So she left, apparently forever if possible. She never gave any indication that she intended to pursue any legal remedies. It is therefore not surprising that this court upheld the trial judge's ruling that Gerlach's offer of proof was insufficient as a matter of law to establish the affirmative defense of necessity.

Perrin's case is different. Perrin did not rely on the defense of necessity. He pointed out that in order to convict him of custodial interference, the State had to prove, as an element of the offense, that he intentionally kept the child from her lawful custodian for a "protracted period." This is an element of the offense that the State had to prove beyond a reasonable doubt.

The parties in *Gerlach* apparently never mentioned this element of the offense.[14] But this court addressed the "protracted period" element of the offense in a footnote to the decision. We offered a potential definition of "protracted period," stating:

If the term "protracted period" is ultimately interpreted to mean "an unreasonably long period under all the circumstances," a jury may then be required to consider the defendant's reasons for withholding the child in determining whether the child was in fact withheld for a protracted period.[15]

We concluded that it was unnecessary for us to resolve this issue and that, in any event, Gerlach's retention of her daughter for over a year "would appear to satisfy the 'protracted period' requirement, however it is defined."[16]

It seems to me that there are a number of things to consider when evaluating the discussion about the "protracted period" element of custodial interference in the *Gerlach* footnote. First, it seems apparent that Gerlach never contended that she did not intend to keep her daughter from her former husband for a "protracted period." This issue was never raised in the trial court or on appeal. Furthermore, looking at Gerlach's offer of proof, it appears that she fully intended to keep her daughter away from her former husband for as long as possible. It is therefore not surprising that this court concluded, as a matter of law, that Gerlach intended to keep the child for a "protracted period." Gerlach understandably conceded the issue.

But the footnote does appear to be helpful in suggesting that "protracted period" means "an unreasonably long period under all the circumstances."[17] And the footnote appears to predict that a jury would ultimately "be required to consider the defendant's reasons for withholding the child in determining whether the child was in fact withheld for a protracted period."[18]

9. *Cleveland v. Anchorage,* 631 P.2d 1073, 1078 (Alaska 1981); *Gerlach,* 699 P.2d at 360.

10. *Schnabel v. State,* 663 P.2d 960, 966 (Alaska App.1983).

11. *Gerlach,* 699 P.2d at 360.

12. *Id.* at 363.

13. *See, e.g., Cleveland,* 631 P.2d at 1081; *Nelson v. State,* 597 P.2d 977, 980 (Alaska 1979); *Wells v. State,* 687 P.2d 346, 350–51 (Alaska App.1984); *Schnabel,* 663 P.2d at 966.

14. *Gerlach,* 699 P.2d at 360 n. 3.

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

Perrin asserted that he did not intentionally keep his daughter from her mother for a protracted period of time. He specifically asserted that his intent was not to abscond with his daughter or to be gone for a protracted period of time. He represented that the longest he intended to keep his daughter was for three or four months. He intended to seek help to protect his daughter from physical abuse.

The question that Perrin raised in his offer of proof was whether he intentionally kept his daughter from her lawful custodian for a "protracted period." The question is, using the *Gerlach* definition, whether he kept her for "an unreasonably long period under all the circumstances."[19] Whether Perrin intended to keep his daughter for a "protracted period" is an element of the offense and a factual question that should be decided by a jury. The jury would "be required to consider the defendant's reasons for withholding the child in determining whether the child was in fact withheld for a protracted period."[20] I agree with Judge Stewart that the court could have instructed the jury that Perrin was required by law to avail himself of legal remedies if possible. Under our system of law, Perrin was entitled to have a jury determine if he violated the law.

### MANNHEIMER, Judge, dissenting.

This case involves an all-too-familiar occurrence: a parent steals a child, flees the state, and conceals the child from the other parent and from the authorities, claiming to be motivated by the belief that the child is being mistreated by the other parent (or the other parent's new spouse or companion).

The defendant in this case, Ronn Perrin, absconded with his three-year-old daughter, fled to the Lower 48, and concealed the child from her mother and the authorities for almost twelve weeks, until he was finally located and arrested by the FBI. Perrin was charged with custodial interference, an offense defined as taking or keeping a child from a lawful custodian "with [the] intent to hold the child ... for a protracted period". AS 11.41.330(a).

Perrin proposed to defend this charge by taking the stand and explaining that his abduction of B.C. was motivated by his belief that the child was in danger of being physically abused or otherwise mistreated if she remained in her mother's household. The trial judge precluded Perrin from presenting this defense.

My two colleagues conclude that Perrin was entitled to present this testimony and to argue this theory of justification to the jury. I conclude that he was not. Our differing views of Perrin's case ultimately rest on our differing interpretations of the custodial interference statute.

As noted above, AS 11.41.330(a) requires the State to prove that the defendant intended "to hold the child ... for a protracted period". My colleagues construe this phrase to mean that, in any prosecution for custodial interference, the State is obliged to prove that the defendant's abduction of the child was unreasonable, given all the surrounding circumstances.

If this is indeed what our statute means, then of course Perrin would be entitled to a new trial—because he should have been allowed to explain his reasons for abducting the child. But the wording of our statute, the derivation of our statute, and the historical context in which the statute was enacted all point to a contrary conclusion—the conclusion that the legislature did *not* intend to allow defendants to litigate whether their act of child abduction was reasonable (except to the extent that the abduction might be justified by one of the defenses codified in AS 11.81.300–450). Thus, Perrin's trial judge correctly precluded him from presenting his proposed defense, and Perrin's conviction should be affirmed.

### *Underlying facts*

Ronn Perrin and Patricia Carlisle, an unmarried couple, had a child, B.C. Perrin and Carlisle separated when B.C. was three years old, and Perrin filed a lawsuit to obtain custody of the child. He was unsuccessful.

---

**19.** *Id.*

**20.** *Id.*

In January 1998, following a trial, the superior court awarded primary physical custody of the child to Carlisle, with Perrin receiving visitation rights.

On May 15, 1999, at the conclusion of a scheduled visit, Perrin absconded with B.C. instead of returning the child to Carlisle. Hiding from the authorities, Perrin took B.C. to California, then to Ohio, then to Oklahoma. On August 3, 1999, the FBI finally caught up with Perrin. He was arrested and charged with first-degree custodial interference under AS 11.41.320.

At his trial, Perrin proposed to defend the charge of custodial interference by testifying that he took B.C. and kept her from Carlisle because he feared that the child was being physically abused by Carlisle's new boyfriend. In an offer of proof (outside the hearing the jury), Perrin took the stand and gave the following explanation of his actions:

During the eighteen months that preceded his flight (basically, from the time that the superior court awarded custody of B.C. to Carlisle until Perrin absconded with the child), Perrin contacted both the Alaska State Troopers and the Division of Family and Youth Services to let them know that he suspected that B.C. was being physically mistreated in Carlisle's household. But both agencies told Perrin that they needed evidence of abuse before they could act.

Frustrated by these agencies' inaction, Perrin decided to engage in self-help. He fled to the Lower 48 with B.C., altering his physical appearance and moving from state to state. Perrin conceded that he kept moving so that he could stay ahead of the authorities, but he asserted that his motive for doing so was beneficent: he was looking for a counseling program for B.C., and he feared that B.C. would not get the counseling she needed if Perrin was arrested and the two of them were brought back to Alaska.

The trial judge refused to allow Perrin to present this explanation to the jury because he concluded that, under Alaska law, a parent's fear of harm to the child is generally not a defense to a charge of custodial interference.

*The legal backdrop of this appeal, and the source of Perrin's proposed construction of the custodial interference statute*

In *Gerlach v. State*, 699 P.2d 358 (Alaska App.1985), this Court held that a parent charged with custodial interference for stealing a child and fleeing the state could not raise a defense of "necessity" based on the parent's fear that the child faced neglect or physical abuse in the other parent's home. In *Gerlach*, we upheld the trial judge's refusal to allow the defendant to offer testimony on this point because we concluded (1) that the defendant had an adequate remedy at law, without resorting to self-help, and (2) generally speaking, the legislature had not intended for defendants to be able to raise a defense of necessity when they were charged with custodial interference.[1]

In this appeal, Perrin concedes that *Gerlach* precludes him from raising a defense of necessity. But Perrin argues that he was not raising an affirmative defense. He insists that he was only requiring the State to prove the elements of the offense.

Perrin asserts that the statutory definition of custodial interference—in particular, the element of "intent to hold the child ... for a protracted period"—implicitly requires the State to prove that the defendant intended to keep the child for a length of time that was "unreasonable" given all the surrounding circumstances. Under this proposed construction of the statute, Perrin argues, he should have been allowed to explain all of his reasons for taking and concealing his daughter, so that he could show that his plan to keep his daughter for several months was a reasonable response to the situation confronting him.

1. *See Gerlach*, 699 P.2d at 362–63. The wording of the opinion is arguably ambiguous as to whether the trial judge precluded the proposed testimony or, instead, allowed Gerlach to present the testimony but then precluded Gerlach from arguing the defense of necessity based on this testimony. The briefs filed in *Gerlach* clarify that the trial judge precluded Gerlach from presenting her proposed testimony. *See* "Brief of Appellant" filed November 9, 1984 in *Gerlach v. State*, File No. A–501, pp. 3–6, and "Brief of Appellee" filed December 21, 1984, pp. 2–5.

(In particular, Perrin asserts that he should have been allowed to explain (1) that he abducted his daughter because he reasonably believed that his daughter needed mental health counseling on account of the situation at Carlisle's home, and (2) that he hid from the authorities for three months because he reasonably believed that, if the authorities found him, he and his daughter would be taken back to Alaska and his daughter would probably not obtain the counseling that she needed, since nobody in Alaska appeared to credit his suspicions of physical abuse.)

One might be tempted to respond that a twelve-week abduction is surely a "protracted period". No one could doubt that B.C.'s twelve-week absence seemed protracted to Carlisle, the mother who did not know where her child was. But Perrin's proposed construction of the custodial interference statute is, in fact, prompted by language in our *Gerlach* decision.

At first blush, *Gerlach* would seemingly be the last place that a defendant in Perrin's position would seek support—for, as explained above, *Gerlach* holds that defendants charged with custodial interference can not rely on the defense of necessity as an after-the-fact justification for taking the law into their own hands to resolve issues of child custody and child safety.

Moreover, the facts of *Gerlach* resemble the facts of Perrin's case in many key respects. Gerlach believed that her former husband was not properly caring for their daughter, and she (like Perrin) had no faith that the legal system would protect her child. Gerlach had little money to pursue further child-custody litigation, and she also believed that the judge assigned to her case was biased against her.[2] For these reasons, Gerlach absconded with the child and hid for more than a year—until she was finally located and arrested in the State of Washington.[3]

At her trial for custodial interference, Gerlach proposed the defense of necessity. She offered to testify that her former husband was not caring properly for their daughter. Gerlach also offered to testify that she knew that her former husband had slapped, beaten, and verbally abused [his children from another marriage] after visits to their mother'.[4] In addition, Gerlach offered testimony that her former husband "disciplined his children by beating them with a belt and slapping them, often for things that were not really their fault", and that he generally "abused [his] children".[5] The purpose of this testimony was to prove Gerlach's state of mind—her justified fear of imminent harm to her daughter if she did not take steps to remove the child from her former husband's custody.[6]

But Gerlach's trial judge concluded that this testimony, even if believed, was insufficient as a matter of law to establish the defense of necessity. He therefore precluded Gerlach from presenting this testimony, and he refused to instruct the jury on necessity.[7] We upheld the trial judge's decision for three reasons.

First, we held that Gerlach's act of child-stealing could not be justified by the doctrine of necessity because she inflicted a harm that was disproportionate to the harm she was trying to avert. By her conduct, Gerlach totally severed her ex-spouse's contact with their child. As we pointed out, even if Gerlach's fears of physical abuse had been shown to be well-founded, so that she was awarded custody of the child or the Division of Family and Youth Services assumed temporary custody of the child, Gerlach's ex-husband still probably would have been allowed controlled visits with the child. Instead, "Gerlach's unilateral action denied [her ex-husband] any contact with [the child] at all".[8]

Second, we held that a necessity defense was not available to Gerlach because the legislature had determined that "a litigant

**2.** *Gerlach,* 699 P.2d at 359–360.

**3.** *Id.* at 359.

**4.** *Id.*

**5.** *Id.* at 360.

**6.** *Id.*

**7.** *Id.*

**8.** *Id.* at 361.

such as Gerlach [should not be allowed] to use a necessity defense as a means of relitigating a [superior court's] custody determination": [9]

> The legislature has recognized the risk of child abuse and neglect and has established remedies to protect vulnerable children.... The legislature has also recognized the emotions involved in child custody disputes and has sought to establish procedures for resolving custody disputes to ensure that the child's interest will not be subordinated to vengeful wars between parents.... To permit a litigant such as Gerlach to use a necessity defense as a means of relitigating a custody determination would not appreciably advance the legislative goals of preventing child abuse and neglect[,] which are adequately protected by existing legislation[,] and [it] would not serve the legislative purposes exhibited in the enactment of the statutes providing a judicial forum to litigate child custody disputes and barring custodial interference. Where the legislature has established procedures for determining custody disputes and separate but complementary procedures for investigating and preventing child abuse and neglect, a person cannot be permitted to ignore those procedures and rely on self-help simply because he or she distrusts lawyers, judges, and social workers.

*Gerlach,* 699 P.2d at 362–63.

Third, we held that custodial interference is a continuing offense. Thus, even though a person might conceivably be justified in taking or keeping a child temporarily in an emergency, a defendant asserting the defense of necessity would have to introduce evidence justifying their act of keeping the child throughout the entire duration of the abduction.[10] Compare our decision in *Wells v. State,* 687 P.2d 346, 350 (Alaska App.1984), where we applied this same rule to the offense of escape.

In *Gerlach,* we suggested that a defendant who reasonably perceived an imminent threat to a child's safety might be justified in temporarily withholding the child from a custodian, but for no longer than was necessary to seek medical or legal advice, or alert the authorities to the perceived danger, or deliver the child to the authorities.[11] We held that the defense of necessity is not available to parents who abscond with a child, leave the state, and hide the child for months.[12]

As noted above, the facts of Perrin's case are quite similar to the facts of *Gerlach.* Like the defendant in *Gerlach,* Perrin stole his daughter, took her into hiding, and eluded the authorities for several months. To justify this conduct, Perrin offered evidence (1) that he suspected that Carlisle's boyfriend was mistreating B.C. and (2) that he believed it was necessary to steal B.C. from Carlisle to ensure the child's safety.

At trial, Perrin's attorney conceded that *Gerlach* precluded Perrin from presenting this evidence to support a defense of necessity. But, as explained above, Perrin's attorney argued that this evidence was not being offered to establish the affirmative defense of necessity, but rather was being offered to rebut one of the elements of the offense—the State's allegation that Perrin intended to hold B.C. for a "protracted period". Under Perrin's construction of the custodial interference statute, in order for the State to prove that Perrin "inten[ded] to hold the child ... for a protracted period", the State was obliged to prove that Perrin's intent to hold the child for three months was unreasonable, given all the circumstances.

Perrin's interpretation of the custodial interference statute is based on the discussion contained in footnote 3 of the *Gerlach* decision. In footnote 3, Judge Singleton (the author of this Court's opinion) noted that the term "protracted period" was not defined in the custodial interference statutes. He then speculated that the phrase "protracted period" could conceivably include a notion of reasonableness:

**9.** *Id.* at 363.

**10.** *Id.* at 362.

**11.** *Gerlach,* 699 P.2d at 362.

**12.** *Id.*

If the term "protracted period" is ultimately interpreted to mean "an unreasonably long period under all the circumstances," a jury may then be required to consider the defendant's reasons for withholding the child in determining whether the child was in fact withheld for a protracted period. *Thus, it may be that the legislature's requirement that the withholding be for a protracted period was intended to [supplant] a necessity defense by in effect requiring the state to disprove necessity in proving the elements of its case.* It is unnecessary for us to reach this issue in this case because Gerlach's retention of Angela in Washington for over a year would appear to satisfy the "protracted period" requirement, however it is defined.

*Gerlach,* 699 P.2d at 360 n. 3 (emphasis added).

Based on the suggestion in this footnote, Perrin argues that the phrase "intent to hold ... for a protracted period" inherently includes the concept that a parent is authorized to withhold a child from another custodian for any length of time that is reasonable under the circumstances. And based on this interpretation of the statute, Perrin insists that he should have been allowed to present evidence (primarily his own testimony, but also the supporting testimony of other witnesses) to prove that he reasonably feared that B.C. would be physically or emotionally harmed if he did not remove her from Carlisle's household and hide her for several months so that she could obtain mental health counseling.

### Clarification of the legal issue

Ultimately, our task in this case is to determine the elements of custodial interference as defined in AS 11.41.330(a).

If Perrin is correct that the offense is defined so as to require proof that the defendant intended to hold the child for an unreasonably long period of time, given all the circumstances—*i.e* ., if the legislature intended for the State to *disprove* the reasonableness of the defendant's actions in each and every prosecution for custodial interference—then Perrin is entitled to a new trial. He should have been allowed to present his proposed testimony, and the jury should have been instructed that Perrin was to be acquitted unless the State proved (beyond a reasonable doubt) that Perrin's plan to hold the child for several months was *not* a reasonable response to the situation (as Perrin reasonably perceived it).

My colleagues, Judge Stewart and Judge Coats, do not describe the issue in quite this way, but their reasons for reversing Perrin's conviction ultimately rest on the fact that they agree with Perrin's interpretation of the custodial interference statute.

In Judge Stewart's lead opinion, he declares that Perrin's conviction must be reversed because Perrin was denied the right to testify—by which he presumably means the right to testify on an issue material to Perrin's guilt or innocence. But Judge Stewart's characterization of the case implicitly hinges on his acceptance of Perrin's argument about the elements of the crime—Perrin's argument that the legislature has defined the offense so as to require the State to prove the unreasonableness of the defendant's conduct. If the offense is construed this way, then Perrin was obviously denied the opportunity to give testimony that was relevant to this element of the crime. But if the offense is not defined in the way Perrin suggests, then Perrin's proposed testimony (like Gerlach's proposed testimony) would not be relevant, and Perrin's trial judge (like Gerlach's trial judge) was justified in excluding this testimony.

(Judge Stewart's opinion might also be read to suggest that the rules governing a defendant's personal testimony are different from the rules governing other witnesses' testimony—that a defendant has a constitutional right to testify about anything, regardless of whether the proposed testimony is relevant and regardless of whether the testimony is more prejudicial than probative. This is not true. Because I am not sure whether Judge Stewart is actually asserting this proposition of law, I have placed my answer to this contention in an appendix to my dissent.)

In Judge Coats's concurring opinion, he declares that Perrin's conviction should be

reversed because Perrin was denied his right to jury trial. According to Judge Coats, when Perrin's trial judge refused to allow Perrin to explain the reasons for his abduction of B.C. and refused to instruct the jury that Perrin should be acquitted unless the State proved that Perrin acted unreasonably, the trial judge thereby prevented the jury from deliberating on one of the elements of the crime—the element of Perrin's "intent to hold the child for a protracted period". Again, Judge Coats's approach to the case ultimately rests on his acceptance of Perrin's argument about the elements of the crime— Perrin's argument that the legislature has defined the offense so as to require the State to prove the unreasonableness of the defendant's conduct.

But if Perrin is wrong—that is, if the defendant's reasonableness is *not* an element of the offense—then the trial judge could lawfully prevent Perrin from testifying about his reasons for committing custodial interference, and the judge could likewise deny Perrin's request to have the jury decide his guilt or innocence based on their approval or disapproval of his reasons for committing the crime. If Perrin's proposed testimony was not relevant to his guilt or innocence, and would only encourage the jury to decide the case on an improper basis (*i.e.*, their sympathy for Perrin or their dislike of Carlisle and her new boyfriend), then Perrin's trial judge could do the same thing that we upheld in *Gerlach*—prevent the introduction of the testimony, and refuse to instruct the jury on the proposed defense.

I therefore turn to the real issue: Did the Alaska Legislature define custodial interference so as to require the State to disprove the reasonableness of the defendant's motive for taking and withholding the child?

*Interpreting Alaska's definition of custodial interference*

Perrin and my two colleagues all base their position on the assumption that the *Gerlach* footnote contains an accurate interpretation of the custodial interference statute. That is, they assume that when the Alaska Legislature included the phrase "intent to hold ... for a protracted period" in the definition of custodial interference, the legislature meant this phrase to be shorthand for "intent to hold ... for an unreasonably long period under all the circumstances". If the statute were construed this way, the State would always be required to *disprove* the reasonableness of the defendant's motivation for taking or keeping the child. And thus, defendants would always be entitled to explain their reasons for abducting the child.

But neither Perrin nor either of my colleagues offers any authority for this interpretation of the statute, other than the footnote in *Gerlach*. This is troubling because the *Gerlach* footnote contains no authority on this point. Indeed, the footnote declares that this is only a *potential* reading of the statute—and the footnote explicitly disclaims any intent to resolve this issue of statutory construction.

Because the task is to ascertain what the Alaska Legislature meant when they defined the crime of custodial interference to require proof of the defendant's intent to hold the child for a "protracted period", I now turn to the traditional method of answering such questions: examining the wording of the statute, the origins of the statute, and the historical context in which the statute was drafted.

*(a) The historical context of our custodial interference statute*

In the middle of the last century, with divorce rates climbing and interstate travel becoming easier and cheaper, this country began to experience an epidemic of child abduction by parents and relatives—abductions generally motivated by the desire to annul or avoid an adverse custody decree. The Commentary to the Model Penal Code contains a lengthy description of this social problem as it existed at that time:

> Willful defiance of [child] custody orders [was] a serious practical problem. [United States] Supreme Court decisions ... allowed one state to refuse enforcement of another state's custody order in a variety of circumstances. The second state [could] reopen [another state's] custody decree if the issuing state lacked jurisdiction over the non-custodial parent or if the original

state would allow modification of the [custody] order under the doctrine of changed circumstances. [This] latter ground ... proved so flexible that it encourage[d] disappointed [litigants] to flee to other jurisdictions in order to obtain reconsideration of custody decrees. Moreover, a parent who violate[d] a court order and fle[d] the jurisdiction [might] well escape punishment by the issuing court. That court [had to] rely on the contempt sanction to enforce its decree, and civil contempt [was often] not considered a sufficient ground for extradition. Indeed, some courts [had] gone so far as to hold that contempt proceedings against the abducting parent [were] no longer appropriate once he obtain[ed] a court order [in another state] awarding him custody of the child. While the proposed Uniform Child Custody Jurisdiction Act would greatly alleviate the problem of "legalized abduction" by noncustodial parents, it [had] yet to find anything approaching general acceptance among the states.

American Law Institute, *Model Penal Code and Commentaries* (Official Draft and Revised Comments, 1980), Part II, § 212.4, pp. 259–260 (footnotes omitted).

The National Conference of Commissioners on Uniform State Laws expressed similar dismay over the situation in their "Prefatory Note" to the proposed Uniform Child Custody Jurisdiction Act (1968):

It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will [abduct] the child in an unguarded moment or fail to return [the child] after a visit and will [then] seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody....

The harm done to children by these experiences can hardly be overestimated. [One need not be] an expert in the behavioral sciences to know that a child, espe-

cially during [its] early years and the years of growth, needs security and stability of environment and a continuity of affection....

This unfortunate state of affairs has been aided and facilitated rather than discouraged by the law.... The judicial trend has been toward permitting custody claimants to sue in the courts of almost any state, no matter how fleeting the contact of the child and family was with [that] particular state, [and] with little regard to any conflict of law rules.... [T]he courts of various states have acted in isolation and at times in competition with each other, often with disastrous consequences....

In this confused legal situation[,] the person who has possession of the child has an enormous tactical advantage. Physical presence of the child [in a state] opens the doors of [its] courts to [custody] petitions and often assures [the claimant] of a decision in his favor. It is not surprising then that custody claimants tend to take the law into their own hands, that they resort to self-help in the form of child-stealing, kidnapping, and various other schemes to gain possession of the child.

*Uniform Laws Annotated* (1999), Vol. 9, Part 1A, pp. 263–64.

In 1977, in an effort to address these social evils, the Alaska Legislature adopted the Uniform Child Custody Jurisdiction Act.[13] And in that same year, Alaska's Criminal Code Revision Subcommission drafted our custodial interference statutes, AS 11.41.320 and AS 11.41.330.[14]

#### (b) The origin of our definition of custodial interference

According to the derivation table in the Tentative Draft of the Alaska Criminal Code, Alaska's definition of custodial interference (AS 11.41.330) is taken from Oregon's custodial interference statute, Oregon Revised

---

**13.** *See* SLA 1977, ch. 61, § 1. That act has now been superseded by the Uniform Child Custody and Jurisdiction Enforcement Act, AS 25.30.300–910 (enacted in SLA 1998, ch. 133, § 2).

**14.** *See Alaska Criminal Code Revision, Tentative Draft,* Part I (February 1977), pp. 53–54 (text of the proposed statutes) and pp. 62–63 (commentary).

Statutes § 163.245.[15] The Oregon definition of the crime differs from ours in several ways [16], but Oregon's definition mirrors our definition in requiring proof that the defendant intended to hold the child "permanently or for a protracted period".[17]

The commentary to the Oregon statute does not directly explain what the drafters meant by "for a protracted period". However, the Oregon commentary strongly suggests that the statute was *not* intended to allow defendants to litigate (or relitigate) the merits or the reasonableness of their child custody situation when they are prosecuted for custodial interference:

> The intervention of the courts is necessary to adequately safeguard the child's welfare and sense of security. Without the inhibiting influence of a penal statute prohibiting child-stealing, the law of custody could be reduced to a "seize and run" policy[,] since the only deterrent to such conduct would be [an ineffectual] contempt of court proceeding.

> The Commission believes [that] the courts have a duty to protect the interests and welfare of the child in custody disputes and cases where a removal from custody adversely affects the child's welfare. The court must have the power to compel adherence to its [custody] decisions.

Oregon Criminal Code Revision Commission, Commentary to O.R.S. §§ 163.245 and 163.257 (reprinted in: Oregon District Attorneys Association, *Oregon Criminal Code of 1971* (December 1975), p. 130).

**15.** *See Alaska Criminal Code Revision, Tentative Draft,* Part I (February 1977), Appendix II ("Derivations"), p. 98.

**16.** The Oregon statute states: "A person commits the crime of custodial interference in the second degree if, knowing or having reason to know that he has no legal right to do so, he takes, entices, or keeps a person from his lawful custodian with intent to hold him permanently or for a protracted period."

**17.** Oregon's definition is, in turn, taken from New York Penal Laws, § 135.45, "custodial interference in the second degree". *See* Oregon Criminal Code Revision Commission, Commentary to O.R.S. §§ 163.245 and 163.257, "Deriva-

This conclusion—that criminal trials for custodial interference were not intended to be a forum for litigating the reasonableness of an existing child custody decree or child custody arrangement—is even more apparent when we compare the Oregon and Alaska custodial interference statutes to Model Penal Code § 212.4(1), the American Law Institute's suggested provision on custodial interference that was published in 1962 (*i.e.,* nine years before Oregon drafted its revised criminal code, and fifteen years before Alaska drafted its revised criminal code).

Model Penal Code § 212.4(1) reads:

[*Interference with* ] *Custody of Children.*

> A person commits an offense if he knowingly or recklessly takes or entices any child under the age of 18 from the custody of its parent, guardian, or other lawful custodian, when he has no privilege to do so. It is an affirmative defense that:

> (a) the actor believed that his action was necessary to preserve the child from danger to its welfare; or

> (b) the child, being at the time not less than 14 years old, was taken away at its own instigation without enticement and without purpose to commit a criminal offense with or against the child.

*Model Penal Code and Commentaries,* p. 248.

One immediately notices that this Model Penal Code provision contains two affirmative defenses that were not adopted by the drafters of the Oregon and the Alaska criminal codes. For purposes of Perrin's case, the first of these omitted defenses is the more

tion" (reprinted in: Oregon District Attorneys Association, *Oregon Criminal Code of 1971* (December 1975), p. 129). (At least in its reprinted form, the Oregon commentary mistakenly refers to New York Penal Law § 134.45. There is no such statute; the correct reference is § 135.45.)

The New York custodial interference statute reads, in pertinent part: "A person is guilty of custodial interference in the second degree when . . . [, being] a relative of a child less than sixteen years old, intending to hold such child permanently or for a protracted period, and knowing that he has no legal right to do so, he takes or entices such child from his lawful custodian[.]" The New York statute is based on the Model Penal Code. *See Kennedy v. State,* 640 So.2d 22, 31 (Ala.Crim.App.1993).

important: the provision that would exonerate defendants who "believed that [their] action was necessary to preserve the child from danger to its welfare". The accompanying Model Penal Code commentary explains that this proposed defense hinged on the defendant's *subjective* belief; that is, the Model Penal Code did not even require that the defendant's belief be reasonable.[18]

Even at the time, the drafters of the Model Penal Code conceded that their proposed defense might reasonably be criticized as constituting a substantial encouragement to child-stealing.[19] And, in fact, I have been unable to find a single jurisdiction that has adopted the subjective good-faith defense proposed by the Model Penal Code.

There are states whose custodial interference statutes contain provisions that *look* like the Model Penal Code's suggested defense— *i.e.*, provisions that exonerate a defendant whose motive was to protect the child from a danger to its welfare. But these provisions have been interpreted narrowly, so that they extend no farther than the type of short-term necessity that this Court described in *Gerlach*—the necessity to take action when there is no time to resort to normal lawful procedures.

For instance, Pennsylvania has enacted the Model Penal Code provision, complete with the defense for defendants who act from the belief that their conduct will preserve the child from a danger to its welfare. *See* 18 Penn. Stats. § 2904(b)(1).[20] But in *Commonwealth v. Couch*, 731 A.2d 136 (Pa.Super.1999), the court held that a defendant who wishes to assert this defense must show that the danger to the child was so immediate that normal legal procedures would not suffice to protect the child:

> Custody law provides for certain procedures to be followed in a civil action to challenge custody if a party believes that the best interests of the child are not being met by the primary custodian. Therefore, in order for the statutory justification defense to apply to a criminal offense of taking and concealing a child, there must be some instant danger present such that to follow the prescribed civil procedures would threaten the immediate welfare of the child.

*Couch*, 731 A.2d at 144.

In *State v. McCoy*, 143 Wis.2d 274, 421 N.W.2d 107 (1988), the Wisconsin Supreme Court addressed a similar issue. Former Wisconsin Statute § 946.715 provided a defense for custodial interference if the abduction is motivated by the intent to protect the child from "imminent physical harm". In *McCoy*, the Wisconsin court rejected the suggestion that "imminent" harm should be interpreted to include any "continuing and projected harm". The court explained that, if the statute were construed in the manner the defendant suggested, this would prompt parents and relatives to disregard custody decrees and to engage in self-help:

> Imbuing the term "imminent" with the broad meaning sought by the defendant would [dis]courage ... resort to legal remedies such as obtaining a restraining order. The manifest intent of this [defense] is that a reasonable removal [of a child] for purposes of safety [will] be permitted[,] but not to the exclusion of resort to the court system. Any other more extended concealment, though initially justified, would only victimize the child, wrongfully depriving the other parent of the opportunity to have contact with that child, and interfering in the child's relationship with the other parent.

*McCoy*, 421 N.W.2d at 114.

The Wisconsin court went on to explain the underlying rationale of its interpretation of the statute:

> Children unfortunately are often the pawns in the domestic struggles between their parents. One parent may try ... to deprive [their] mate, whom they now see as their enemy, of one of life's great treasures, ... the physical presence and com-

---

**18.** *See Model Penal Code and Commentaries*, pp. 259–261.

**19.** *See id.*

**20.** This portion of the statute reads: *"Defenses. It is a defense that ... the actor believed that his action was necessary to preserve the child from danger to its welfare[.]"*

pany of one's child by the concealment of that child.... See Agopian and Anderson, *Legislative Reforms to Reduce Parental Child Abductions*, 6 J.Juv.L. 1, 2–3 (1982); *Oversight Hearing on the Parental Kidnaping Prevention Act of 1980 Before the Subcomm. on Crime of the House Comm. on the Judiciary*, 97th Cong., 1st Sess. (1981) (statement of Representative William J. Huges, chairman of the subcommittee) ("child snatching is one of the most serious and damaging forms of child abuse that exists. The severity of the trauma of child snatching is one of the few points that behavioral scientists agree upon, almost without exception.").... The [Wisconsin] legislature has wisely provided that concealment of a child by one parent from the other parent is justified [only] if done "to protect the child from imminent physical harm." Section 946.715(2)(a), Stats.

When parents have reached an impasse in their relationship to each other and with their children, the resolution in a civilized society should be made by institutions established for such purpose. In our society we have given that duty to the court system. It is in the courts that disputes such as presented here should be resolved except in those situations where action is required by one parent to protect a child from imminent physical harm.

*McCoy*, 421 N.W.2d at 114–15.[21]

More important, for present purposes, is the fact that the drafters of Oregon's custodial interference statutes completely rejected the Model Penal Code's proposed defense for child abductors motivated by a concern for the child's welfare. The Oregon drafters' choice is important because Alaska's custodial interference statutes are based on Oregon's.

The Oregon Court of Appeals discussed their state's policy choice in *State v. Easton*, 35 Or.App. 603, 582 P.2d 37 (1978). The

defendant in *Easton* was convicted of custodial interference. On appeal, he claimed that he was unfairly deprived of the opportunity to defend the charge by showing that his abduction of the child was reasonably necessary to preserve the child from harm. The Oregon Court of Appeals answered that this was no defense to a charge of custodial interference:

> [The defendant] appears to attack the statute on the ground that, as the statute is now drawn, there is no opportunity for a defendant to demonstrate that his taking of a child in apparent violation of the statute was based upon a good-faith belief that taking or keeping the child was necessary for the child's best interests. There is simply no merit in such an argument. The legislature has made the determination, as it was entitled to, that, absent some showing of immediate physical danger to the child, individuals involved in a custody battle over children are not going to be permitted to steal the children back and forth.

*Easton*, 582 P.2d at 39–40 (footnote omitted).[22]

When the drafters of Alaska's criminal code wrote our definition of custodial interference, they not only took the phrase "intent to hold ... for a protracted period" from the Oregon statute, but they also followed the lead of the Oregon drafters by not including an affirmative defense for defendants whose abduction of a child was motivated by a desire to preserve the child from danger.

The Alaska drafters were obviously aware of the Model Penal Code's "Interference with Custody" provision, § 212.4(1), and the Model Penal Code's suggested defense for child abductions motivated by an intent to preserve the welfare of the child. (The approved draft of the Model Penal Code had been issued fifteen years before, in 1962.) Indeed, the drafters of Alaska's code quoted the commentary to Model Penal Code

---

21. In 1987, Wisconsin Statute § 946.715 was repealed and replaced by § 948.31. Nevertheless, *McCoy* continues to be cited with approval for its interpretation of the Wisconsin offense of custodial interference. *See, e.g., State v. MacDonell*, 2001 WL 477436 *2, *6 (Wis.App.2001); *State v. Inglin*, 224 Wis.2d 764, 592 N.W.2d 666, 674 (App.1999).

22. The omitted footnote quotes Oregon Statute § 161.209, which authorizes a person to use a reasonable amount of force to defend third persons from imminent unlawful force.

§ 212.4(1) when they declared that the aim of Alaska's custodial interference statutes was to "protect parental custody against all unlawful interruption".[23] But the Alaska drafters did not adopt the "intent to preserve the child from danger" defense that had been proposed in the Model Penal Code. Instead, they based our custodial interference statutes on Oregon's statutes—statutes that, according to the *Easton* decision, were written so as not to allow any such defense.

> (c) *My conclusion: The element of "intent to hold the child ... for a protracted period" was not intended to allow defendants to litigate whether their act of child abduction was reasonable under the circumstances*

As I explained above, the main issue in this case is a question of statutory construction. Our task is to determine what the legislature meant when they enacted a definition of custodial interference that requires the State to prove that the defendant "inten[ded] to hold the child ... for a protracted period".

Without citing any pertinent authority, Perrin and my two colleagues assert that this phrase was intended to embody the requirement that, in all prosecutions for custodial interference, the State must prove (beyond a reasonable doubt) that the defendant's abduction of the child was unreasonable under the circumstances. This conclusion completely disregards the social evil that the statute was intended to address—the widespread practice of child-stealing as a method to avoid or circumvent adverse custody decrees.

This conclusion also disregards another aim of the custodial interference statutes that we noted in *Strother v. State*, 891 P.2d 214 (Alaska App.1995). In *Strother*, we recognized that "[t]he emotional and financial costs suffered by [a parent] in trying to locate [their missing child] are among the primary evils that the [custodial interference] statute was intended to deter". *Id.* at 221–22. (This passage from *Strother* is a quote from the decision of the Oregon Court of Appeals in *State v. West*, 70 Or.App. 167, 688 P.2d 406,

408 (1984), which in turn was based on the Commentary to the Oregon Criminal Code.)

The custodial interference statutes are designed to make people come to court and/or seek the intervention of the authorities when they have reasonable concerns about a child custody arrangement or the wisdom of an existing child custody decree. These statutes are designed to deter parents and relatives from taking the law into their own hands, even when they may have good reason to suspect that a child is being mistreated. As courts and commentators have noted, even a well-motivated child abduction may adversely affect the emotional welfare of the child. Moreover, even a well-motivated child abduction inflicts emotional suffering and financial costs on the parent whose child has been stolen and is being held in an undisclosed location.

The definition of custodial interference advocated by Perrin and my colleagues also disregards the history of our statute. The drafters of Alaska's custodial interference statutes could have followed the Model Penal Code's suggestion and expressly codified a defense for people whose act of child abduction was motivated by an intent to preserve the child from harm. Instead, the Alaska drafters patterned our custodial interference statutes on Oregon's corresponding statutes. As explained above, Oregon has rejected an "intent to preserve the welfare of the child" defense (except to the extent that it is already covered by the general justification provisions of the Oregon criminal code—*e.g.*, necessity or defense of others).

For these reasons, I conclude that the musings in the *Gerlach* footnote are just that—musings. Contrary to Judge Singleton's speculations, Alaska's custodial interference statutes were not drafted to require the State to negate any potential claim of necessity, nor was the phrase "intent to hold ... for a protracted period" meant to require the State to disprove the reasonableness of the defendant's decision to abduct the child. Instead, our custodial interference statutes were intended to preclude this sort of defense. People who are dissatisfied with a

---

**23.** *Alaska Criminal Code Revision, Tentative Draft,* Part 1 (1977), p. 65.

custody decree must pursue their legal remedies in court—not steal the child and then, if caught, make the State prove that there was no reasonable basis for the abduction.

Just like the trial judge in *Gerlach* (who precluded the defendant from testifying about her reasons for abducting her child, and who refused to instruct the jury on the defense of necessity), Perrin's trial judge properly precluded Perrin from testifying about his reasons for abducting his daughter, and the judge properly refused to instruct the jury that they should acquit Perrin unless the State proved, beyond a reasonable doubt, that Perrin's abduction of the child was unreasonable.

For these reasons, I would affirm Perrin's conviction.

*The meaning of the phrase "protracted period"*

Thus far, I have been occupied with the task of explaining what the phrase "protracted period" does *not* mean. In particular, I have been trying to demonstrate that this phrase was not intended to require proof of "lack of good reason for the abduction" in prosecutions for custodial interference. The drafters of our custodial interference statutes did not intend to require the State to disprove the arguable reasonableness of the defendant's act of child abduction as an element of the crime.

Strictly speaking, that is all we must decide in this case. If the reasonableness of Perrin's conduct (or, rather, the unreasonableness of his conduct) is not an element of the offense, then Perrin's conviction can be affirmed, and we can leave the exact meaning of the phrase "protracted period" for another day. That being said, there is a portion of the Model Penal Code commentary that suggests what the Oregon drafters and the Alaska drafters had in mind when they required proof of the defendant's intent to hold the child for a "protracted period".

As explained above, Model Penal Code § 212.4(1) is the section that prohibits custodial interference. Section 212.4(1) defines the offense as "tak[ing] or entic[ing] any

child under the age of 18 from the custody of its parent, guardian, or other lawful custodian, when [the defendant] has no privilege to do so".

The commentary to this section declares that this definition was not intended to "reach every *de minimis* instance of unauthorized movement [of a child]".[24] The commentary then discusses an earlier draft of the same section—a draft that

> undertook to distinguish between significant and insignificant acts [of custodial interference] by limiting liability to [acts of] removal "for so extended a period as would be likely to substantially supplant the custodian's authority over the child". The Council found this language cumbersome and concluded that the [same] idea is conveyed adequately by defining the offense as a taking from custody. This formulation connotes a substantial interference with parental control, as distinguished from mere physical removal from the custodial premises for a brief period.

*Model Penal Code and Commentaries*, pp. 257–58.

Obviously, one might reasonably question the Model Penal Code drafters' conclusion that the phrase "take from custody" conveys exactly the same idea as "take from custody for so extended a period as would be likely to substantially supplant the custodian's authority over the child". Without reading the accompanying commentary, one would be hard-pressed to deduce this limitation on the scope of liability from the wording of § 212.4(1) itself.

Although neither the Oregon commentary nor the Alaska commentary discusses this point, I believe it is reasonable to conclude that the Oregon drafters and the Alaska drafters included the phrase "intent to hold the child ... for a protracted period" in our states' custodial interference statutes for the very purpose of clarifying that the crime of custodial interference was not intended to apply to every *de minimis* deprivation of custody, and that criminal liability under the custodial interference statutes should be limited in a manner similar to the limitation

24. *Model Penal Code and Commentaries*, p. 257.

contained in the earlier draft of the Model Penal Code.

But rather than distinguishing *de minimis* abductions from punishable abductions based on the *actual* duration of the abduction, the Oregon and Alaska statutes draw the line based on the *planned* duration of the abduction—by requiring proof that the defendant *intended* to hold the child for a length of time that would substantially defeat the victim custodian's right of physical custody. This allows the conviction of defendants who planned to hold the child for a lengthy period but who, through good fortune, were apprehended after only a brief time.

This, I believe, is the intended meaning of the phrase "intent to hold the child ... for a protracted period". It refers to the defendant's intent to withhold the child from the victim-custodian for so long a time as to substantially defeat the victim's right to physical custody (whether primary custody or limited custody).[25]

### Appendix

#### *Permissible Limitations on a Defendant's Right to Testify*

Judge Stewart's opinion might be read to suggest that a defendant in a criminal trial has a constitutional right to testify about anything—even if the proposed testimony is not relevant and is therefore barred by Evidence Rule 402, or even if the proposed testimony is more prejudicial than probative and is therefore excludable under Evidence Rule 403.

As his sole authority for this proposition, Judge Stewart quotes *Hughes v. State,* 513 P.2d 1115, 1119 (Alaska 1973), where our supreme court stated that a defendant's right to testify is of such importance that "[n]o defendant requesting to testify should be deprived of exercising that right and conveying his version of the facts to the court or jury". But *Hughes* does not deal with the issue of whether a defendant is specially entitled to give testimony in violation of the rules of evidence. Rather, *Hughes* deals with a very different issue—the question of whether criminal defendants have the right to take the stand at trial despite their attorneys' advice to the contrary.

*Hughes* declares that defendants have the final word on whether they will testify. But *Hughes* does not address the question of whether defendants have the right to present irrelevant or unfairly prejudicial testimony. To gloss over this problem, Judge Stewart quotes only part of the supreme court's statement concerning a defendant's right to testify. What the supreme court actually said in *Hughes* was that a defendant's right to testify is so important that "[n]o defendant requesting to testify should be deprived of exercising that right and conveying his version of the facts to the court or jury, *regardless of competent counsel's advice to the contrary* ".[26] (emphasis added)

In *Hughes,* the defendant's proposed testimony was clearly relevant and admissible. Although our supreme court did not describe the details of Hughes's anticipated testimony, the court stated that "most of what [Hughes] wanted to say [was already] presented to the jury by means of the statement which he gave to the police".[27] Thus, the relevance (and admissibility) of this testimony was not disputed.

But relevance is the central issue in Perrin's case—because the relevance of Perrin's proposed testimony hinges on how we interpret the custodial interference statute. If Perrin's interpretation of "protracted period" is correct, then his proposed testimony was relevant to the jury's decision of whether he intended to hold his daughter for a protracted period. Conversely, if Perrin's interpretation of "protracted period" is wrong, then his proposed testimony was not relevant to any issue facing the jury, and his proposed testimony would almost surely have encour-

---

25. Compare our decision in *Strother v. State,* 891 P.2d 214 (Alaska App.1995), where we held that even when physical custody of a child is jointly shared by two parents, a parent can commit custodial interference if that parent "takes custody of the child and exercises that custody in a manner that defeats the custody rights of the other parent". *Id.* at 224.

26. *Id.* at 1119.

27. *Id.* at 1120.

aged the jury to decide the case on improper grounds.

If Perrin's proposed testimony was irrelevant, it was barred by Evidence Rule 402. If the proposed testimony was more prejudicial than probative, the trial judge could properly preclude it under Evidence Rule 403.

This Court has repeatedly upheld trial judges who precluded a defendant from presenting irrelevant or overly prejudicial testimony. One example that has already been extensively discussed is *Gerlach v. State*, 699 P.2d 358 (Alaska App.1985). In *Gerlach*, this court upheld a trial judge who precluded the defendant from testifying about her reasons for abducting her daughter and holding her for twelve months. We ruled that the trial judge properly prevented Gerlach from testifying about these matters because Gerlach's proposed testimony was relevant only to the defense of necessity, a defense that was not legally available to her.[28]

Similarly, in *Degler v. State*, 741 P.2d 659 (Alaska App.1987), a defendant on trial for robbery wished to testify that he committed this crime because he desperately needed money to fly to Idaho to attend a child custody hearing and maintain custody of his daughter; the defendant wanted to make sure that his ex-wife (whom he considered to be an unfit parent) did not obtain custody of the child.[29] The trial judge ruled that this evidence, even if believed, was insufficient as a matter of law to prove either the defense of necessity or the defense of duress. The trial judge therefore precluded the defendant from giving the proposed testimony.[30] We agreed with the trial judge's interpretation of the law, and we therefore upheld the trial judge's decision to preclude the defendant

from testifying about his reasons for committing the robbery.[31]

Another more recent example is *Busby v. State*, 40 P.3d 807 (Alaska App.2002), where we held that the trial judge could lawfully have prevented the defendant from testifying in support of his sole defense—a mistake-of-law defense—because such defenses are litigated to the court (not the jury), and thus the defendant's proposed testimony was irrelevant to any of the issues to be decided by the jury.[32]

*Gerlach, Degler,* and *Busby* are ultimately grounded on the principle that irrelevant evidence is inadmissible. This principle is codified in Alaska Evidence Rule 402 and in Federal Evidence Rule 402. In *Gerlach, Degler,* and *Busby*, the defendants proposed to testify about matters that were irrelevant to the jury's decision of the case—irrelevant in *Gerlach* and *Degler* because the defenses of necessity and duress were not available to the defendants as a matter of law, and irrelevant in *Busby* because the issue that the defendant wished to litigate (mistake of law) is not decided by the jury. In all three cases, this Court ruled that the trial judges had properly exercised their authority when they precluded the defendants from presenting their proposed testimony to the jury. In other words, Evidence Rule 402 limits the testimony of defendants just as it limits the testimony of other witnesses. Defendants have no due process right to take the stand and present irrelevant testimony.

Despite our decisions in *Gerlach, Degler,* and *Busby*, Judge Stewart appears to assert that a trial judge is powerless to enforce Evidence Rule 402 against a defendant who wishes to testify but whose testimony is irrelevant to the issues to be decided by the jury. I am unaware of any court decision, state or

---

28. *Gerlach*, 699 P.2d at 359–360, 363. To reiterate what was said in footnote 1 of this dissent: The wording of the *Gerlach* opinion is arguably ambiguous as to whether the trial judge precluded the proposed testimony or, instead, allowed Gerlach to present the testimony but then precluded Gerlach from arguing the defense of necessity based on this testimony. The briefs filed in *Gerlach* clarify that the trial judge precluded Gerlach from presenting her proposed testimony. *See* "Brief of Appellant" filed November 9, 1984 in *Gerlach v. State*, File No. A–501, pp. 3–6, and

"Brief of Appellee" filed December 21, 1984, pp. 2–5.

29. *Degler*, 741 P.2d at 660.

30. *Id.*

31. *Id.* at 661.

32. *Busby*, 40 P.3d at 816–17.

federal, holding that Evidence Rule 402 does not apply to the testimony of criminal defendants. Indeed, the United States Supreme Court has stated that the defendant in a criminal case "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence".[33]

Moreover, even when the defendant's proposed testimony is admittedly relevant, the United States Supreme Court has rejected "[t]he proposition that the Due Process Clause guarantees the right to introduce all relevant evidence".[34] The Court called this proposition "simply indefensible".[35] For instance, in *Rock v. Arkansas*[36], even though the Supreme Court declared that an accused has a "fundamental ... right to present his own version of events in his own words ... by calling ... himself as a witness"[37], the Court also declared that a state "would be well within its powers" in preventing a defendant from testifying if, "[under] established guidelines [for] the evaluation of post-hypnosis testimony[, the state is] able to show that [the proposed] testimony in a particular case is so unreliable that exclusion is justified".[38] After *Rock*, at least three states have held that trial judges have the authority to prevent a defendant from testifying if the defendant underwent hypnosis and, given the circumstances, the defendant's proposed testimony is shown to be unreliable.[39]

More generally, "[a defendant's] right to present relevant testimony ... may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process [so long as these] restrictions of a defendant's right to testify [are] not ... arbitrary or disproportionate to the purposes they are designed to serve."[40] One of the long-recognized and legitimate reasons for restricting the admission of evidence is to "avoid[ ] litigation [of] issues other than the guilt or innocence of the accused".[41]

This is the principle behind Alaska Evidence Rule 403, which authorizes a trial judge to exclude admittedly relevant evidence if the probative value of that evidence is outweighed by the danger that the evidence would prejudice the fairness of the trial, confuse the issues, or otherwise mislead the jury. Evidence Rule 403 empowers a trial judge to exclude evidence if admission of that evidence would pose a substantial risk of deflecting the jury from their task of reaching a proper verdict under the law. In the present case, Judge Smith relied on this principle as an alternative ground for excluding Perrin's proposed testimony. The judge concluded that Perrin's testimony would only encourage the jury to ignore their duty to decide Perrin's case under the applicable law—by encouraging them to speculate as to whether Perrin's actions might have been justified by necessity (a defense that Perrin conceded was not available to him), or by prompting the jurors to reach a result based on their sympathy or enmity toward the people involved in the litigation.

This Court has repeatedly held that a trial judge's proper application of Evidence Rule 403 does not abridge a defendant's right to present testimony.[42] Here, Judge Smith had

---

**33.** *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988).

**34.** *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 2017, 135 L.Ed.2d 361 (1996) (Justice Scalia writing for a four-member plurality).

**35.** *Id.*

**36.** 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

**37.** *Id.*, 483 U.S. at 52, 107 S.Ct. at 2709.

**38.** *Id.*, 483 U.S. at 61, 107 S.Ct. at 2714.

**39.** *See State v. Butterworth*, 246 Kan. 541, 792 P.2d 1049, 1059 (1990) (rejecting the contention that exclusion of a defendant's testimony violates

*Rock v. Arkansas* ); *State v. L.K.*, 244 N.J.Super. 261, 582 A.2d 297, 306 (App.1990) (same); *Tumlinson v. State*, 757 S.W.2d 440 (Tex.App.1988) (same).

**40.** *Rock v. Arkansas*, 483 U.S. at 55–56, 107 S.Ct. at 2711.

**41.** *United States v. Scheffer*, 523 U.S. 303, 314, 118 S.Ct. 1261, 1267, 140 L.Ed.2d 413 (1998).

**42.** *See Heaps v. State*, 30 P.3d 109, 112 (Alaska App.2001); *Ragsdale v. State*, 23 P.3d 653, 663 (Alaska App.2001); *Larson v. State*, 656 P.2d 571, 575 (Alaska App.1982). *See also Brown v. State*, 779 P.2d 801, 804–05 (Alaska App.1989) (proper application of Rule 403 does not abridge a defendant's right to confront the witnesses against him).

good reason for concluding that Perrin's proposed testimony would induce the jury to decide Perrin's case on an improper ground—either the inapplicable defense of necessity, or (potentially) an attack on the character of Carlisle, the child's primary custodian, casting the insinuation that Carlisle did not deserve the protection of the law.

Thus, unless Perrin's testimony had substantial probative value, Judge Smith did not abuse his discretion—and did not abridge Perrin's constitutional rights—when he excluded this testimony. And, again, Perrin's proposed testimony would have probative value only if his interpretation of the phrase "protracted period" is correct. If Perrin has correctly construed what the Alaska Legislature meant by the phrase "protracted period" in the custodial interference statute, then Perrin's proposed testimony had considerable probative value, and Judge Smith abused

his discretion in excluding this testimony. On the other hand, if Perrin is wrong in his interpretation of the statute—if Perrin's intent to hold the child for three or four months constituted an intent to hold the child for a "protracted period", regardless of his reasons for taking the child—then Perrin's proposed testimony had no obvious probative value, and Judge Smith could exclude it— both under Rule 402 (because it was irrelevant) and under Rule 403 (because it created a substantial danger that the jury would be induced to decide Perrin's case on an improper basis).